[Cite as *State v. Haywood*, 2017-Ohio-8299.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| | | |
|---|---|---|
| STATE OF OHIO | | C.A. No.     28040 |
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| DESHANON HAYWOOD | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | CASE No.     CR 2013 05 1404 (A) |

DECISION AND JOURNAL ENTRY

Dated: October 25, 2017

CARR, Judge.

{¶1}    Defendant-Appellant, Deshanon Haywood, appeals from his convictions in the Summit County Court of Common Pleas.  This Court affirms.

I.

{¶2}    During the early morning hours of April 18, 2013, four people were murdered in the basement of an apartment on Kimlyn Circle in Akron.  R.R., one of the victims, resided at the apartment and had received a sizeable amount of heroin the night before his murder.  The three other victims found alongside him were K.W., his girlfriend; M.N., a female friend of K.W.; and K.D., a male friend of R.R.'s.  The police found the apartment in disarray when they arrived on scene and suspected that the victims were killed during the course of a robbery and/or burglary.  When the police obtained R.R.'s cell phone records, they learned that Haywood was the last person to call R.R. and brought him in for questioning.  The police then later examined Haywood's cell phone records and learned that Haywood had received incriminating messages

from another man, Derrick Brantley, around the time the murders were believed to have occurred. Following additional investigation, the police arrested both Haywood and Brantley in conjunction with the murders.

{¶3} A grand jury indicted Haywood on: (1) four counts of aggravated murder; (2) four counts of aggravated felony murder with aggravated robbery as the predicate offense; (3) four counts of aggravated felony murder with kidnapping as the predicate offense; (4) one count of aggravated felony murder with aggravated burglary as the predicate offense; (5) four counts of aggravated robbery; (6) four counts of kidnapping; (7) one count of aggravated burglary; and (8) one count of having a weapon under disability. With the exception of the having a weapon under disability count, each of Haywood's counts also contained an attendant firearm specification. Additionally, all of his aggravated murder and aggravated felony murder counts contained four attendant capital specifications. Following a lengthy period of motion practice, the matter was set for trial.

{¶4} The same trial judge initially presided over Haywood's and Brantley's cases. Brantley's trial occurred first, and a jury found him guilty. The mitigation phase of his trial ended a few weeks before Haywood's trial was set to begin, and his jury recommended life without the possibility of parole. Following that recommendation, the trial judge questioned whether the State ought to pursue the death penalty against Haywood. The judge spoke with the victims' families about the death penalty and then spoke with several prosecutors in chambers, wherein she asked them to dismiss the capital specifications. She also later contacted the Chief Counsel of the prosecutor's office and encouraged him to dismiss the capital specifications. Nevertheless, the State decided to pursue the death penalty against Haywood.

{¶5}   Near the conclusion of voir dire, the State attempted to strike Juror 18, an African-American juror who was morally opposed to the death penalty.  Haywood objected on the basis of *Batson*, and, after hearing argument, the trial judge rejected the State's peremptory challenge.  The trial judge offered as rationale for her ruling that Haywood was "entitled to one juror at least that looks like him."  The State, therefore, renewed its request to strike Juror 18 when another African-American was seated.  It did so twice more when two additional African-American jurors were seated, but the trial court repeatedly denied the State's requests to strike Juror 18.  Eventually, the entire jury panel was selected, and, over the State's objection, Juror 18 remained on the panel.

{¶6}   Once the panel was selected, the State asked the trial judge not to swear in the jury.  The State requested a brief delay to research its options and, possibly, to file an affidavit of disqualification.  Although the trial judge strongly opposed a delay in the proceedings, she agreed to the delay after the State expressed its concern that swearing in the jury would cause jeopardy to attach.  She concluded the day's proceedings without swearing in the jury, and, the following day, the State filed an affidavit of disqualification.  The trial judge then sent the jury home until the issue of her disqualification could be resolved.

{¶7}   The trial judge ultimately recused herself from the proceedings, and a new trial judge was appointed.  The State then filed a motion to quash the jury venire based on the fact that the first judge's biased rulings had tainted the selection process.  Haywood responded in opposition, but the court later granted the State's request to quash the venire.  Consequently, jury selection began anew.

{¶8}   Haywood's trial went forward with a new jury and resulted in guilty verdicts.  Sentencing did not occur, however, because Haywood filed a motion for a new trial.  It was his

contention that the State had engaged in misconduct by failing to disclose the fact that two of its witnesses had received favorable treatment in exchange for their testimony. A period of motion filing and argument resulted in the parties stipulating to a new trial. As such, the court vacated the guilty verdicts, quashed the jury, and set the matter for another trial. The trial court also authorized the use of a special prosecutor to handle the retrial.

{¶9} There is no dispute that the State prosecuted Haywood based on a theory of complicity. At the conclusion of his retrial, the jury found him guilty of (1) complicity to commit the aggravated felony murders of M.N. and K.W., based on the predicate offenses of aggravated robbery, kidnapping, and aggravated burglary; (2) complicity to commit the aggravated robbery of R.R.; (3) complicity to commit the kidnappings of M.N. and K.W.;[1] and (4) five capital specifications pertaining to M.N. and K.W. Haywood was found not guilty on each of his remaining counts and specifications, and the jury later recommended that he receive life in prison with the possibility of parole. The court sentenced him to life in prison with the possibility of parole after 35 years.

{¶10} Haywood now appeals from his convictions and raises ten assignments of error for our review. For ease of analysis, we rearrange and consolidate several of the assignments of error.

II.

**ASSIGNMENT OF ERROR I**

PROSECUTORIAL MISCONDUCT DEPRIVED DESHANON HAYWOOD
OF HIS DUE-PROCESS, FAIR-TRIAL, AND DOUBLE-JEOPARDY RIGHTS.

---

[1] Although the jury also found Haywood guilty of complicity to commit aggravated burglary with respect to M.N. and/or K.W., the trial court later dismissed that charge based on a defect in the indictment.

**ASSIGNMENT OF ERROR II**

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT QUASHED THE FIRST DEATH-QUALIFIED AND LAWFULLY-SELECTED JURY.

**ASSIGNMENT OF ERROR III**

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DELAYED IMPANELING THE FIRST DEATH-QUALIFIED AND LAWFULLY-SELECTED JURY.

{¶11} Haywood's first three assignments of error all stem from his assertion that this matter ought to have been heard by the first jury that the parties selected. He argues that the first trial judge abused her discretion when she agreed to delay impaneling that jury. He also argues that the second trial judge abused his discretion when he quashed the first jury without a sound reason for doing so and without considering reasonable alternatives. Finally, he argues that the State engaged in misconduct when it raised unsupported claims of judicial bias and secured the first jury's dismissal. Haywood asks this Court to vacate his convictions and bar his retrial based on violations of his due process and double jeopardy rights. For the reasons that follow, we reject Haywood's arguments.

{¶12} "A trial court may order a mistrial where some intervening error prejudicially affects the merits of the case and the substantive rights of one or both of the parties." *State v. Sutton*, 9th Dist. Medina Nos. 2066, 2067, 1992 Ohio App. LEXIS 2916, *6 (June 3, 1992). Mistrials may be declared during trial or during jury selection, prior to the jury being sworn in. *Id.* at *5, fn.1. *See also State v. Stambaugh*, 2d Dist. Miami No. 2008 CA 42, 2009-Ohio-7050, ¶ 7-46.

> [A] trial judge is in the best position to determine whether the situation in [the] courtroom warrants the declaration of a mistrial. In examining the trial judge's exercise of discretion in declaring a mistrial, a balancing test is utilized, in which the defendant's right to have the charges decided by a particular tribunal is weighed against society's interest in the efficient dispatch of justice. "[A]

> defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." *Wade v. Hunter*, 336 U.S. 684, 689 (1949). Where the facts of the case do not reflect unfairness to the accused, the public interest in insuring that justice is served may take precedence.

(Internal citations and ellipses omitted.) *State v. Glover*, 35 Ohio St.3d 18, 19 (1988). Because the decision to grant or deny a mistrial lies in a trial court's sound discretion, this Court reviews that decision for an abuse of discretion. *State v. Dickerson*, 9th Dist. Summit No. 22536, 2005-Ohio-5499, ¶ 6.

{¶13} When a trial court acts within its discretion in declaring a mistrial, the Double Jeopardy Clause generally will not bar a retrial. *Glover* at 21. An exception exists and retrial is barred where "the judge's action was instigated by prosecutorial misconduct designed to provoke [the] mistrial * * *." *Id.* In those instances, the Double Jeopardy Clause will not permit a retrial. *State v. Anderson*, 148 Ohio St.3d 74, 2016-Ohio-5791, ¶ 32, quoting *Glover* at syllabus. Yet, jeopardy does not attach in a jury trial "until the jury is impaneled and sworn." *State v. Gustafson*, 76 Ohio St.3d 425, 435 (1996).

{¶14} The record reflects that Haywood's first jury was not impaneled after voir dire because the first trial judge granted the State's request for a delay in the proceedings. The first trial judge did not declare a mistrial at that point, but simply agreed to preserve the status quo for an evening while the State conducted research and decided whether to file an affidavit of disqualification. In essence, the trial court granted the State's motion for a brief continuance. Haywood argues that it was unreasonable for the court to do so because the State did not have a legitimate basis to request the delay.

{¶15} "[T]he decision to grant or deny a continuance lies within the sound discretion of the trial court * * *." *State v. Bennett*, 9th Dist. Lorain No. 12CA010286, 2014-Ohio-160, ¶ 22. In reaching its decision, the court should consider

> the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case.

*State v. Unger*, 67 Ohio St.2d 65, 67-68 (1981). The court must balance "'any potential prejudice to a [party against] concerns such as a court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice.'" (Alteration sic.) *State v. Sauto*, 9th Dist. Summit No. 26404, 2013-Ohio-1320, ¶ 17, quoting *In re C. G.*, 9th Dist. Summit No. 26506, 2012-Ohio-5999, ¶ 8, quoting *Unger* at 67.

{¶16} Upon review, we cannot conclude that the first trial judge abused her discretion when she granted the State's request for a continuance. The record reflects that the State sought one very brief delay for the purpose of deciding whether to file an affidavit of disqualification. As support for its request, the State specifically noted its concern that the judge (1) had not allowed it to strike a juror who was morally opposed the death penalty, and (2) had encouraged prosecutors, on two separate occasions, to dismiss the capital specifications against Haywood. The State also specifically noted its concern that its options for redress might be limited if the jury was sworn in and jeopardy was allowed to attach. By affording the State a continuance, the first trial judge gave the State an opportunity to file its affidavit and stay the proceedings so that its concerns could be addressed before the matter proceeded any further. *See* R.C. 2701.03(D)(1) (affidavit of disqualification divests judge of jurisdiction until the Chief Justice rules upon the affidavit). Because this was a death penalty case, the stakes at trial were extremely high for both

sides, and any prejudice Haywood suffered as a result of the delay was minimal, given that the judge's ruling merely preserved the status quo for a day. *See Sauto* at ¶ 17. Under these facts and circumstances, it was not unreasonable for the court to permit the continuance out of an abundance of caution.

{¶17} Because the first trial court judge recused herself before the Chief Justice ruled on the State's affidavit of disqualification, there was never a determination made regarding her alleged bias. Following her recusal, however, the State maintained that her bias had tainted the jury selection process. The State asked the second trial judge to quash the jury that had been selected, and Haywood opposed the State's motion. The second trial judge did not adopt the State's rationale, but ultimately agreed to quash the jury based on the "untenable position" in which he had been placed. The second trial judge found that he lacked jurisdiction to decide his colleague's alleged bias and, likewise, to judge "as an appellate reviewer" whether she had made appropriate decisions during the jury selection process. Nevertheless, he found that "the integrity of the judicial system" would be placed in jeopardy if he were to proceed with the trial when the case was "so potentially clouded in error." He decided "under these extraordinary circumstances" to err on the side of caution and order the jury selection process to start anew.

{¶18} Haywood argues that the State engaged in misconduct by essentially goading the trial court into declaring a mistrial and quashing the first jury. He argues that the bias claims the State raised were meritless and were asserted strictly to avoid trying the case before a jury it found unfavorable. On a related note, he argues that the second trial judge abused his discretion when he quashed the first jury based on the State's meritless allegations. He asserts that the court failed to undertake a sound reasoning process or to consider reasonable alternatives such as reconfirming the jury in question or replacing Juror 18 with an alternate juror.

**{¶19}** In deciding whether a prosecutor's conduct rises to the level of prosecutorial misconduct, a court determines if the prosecutor's actions were improper, and, if so, whether the defendant's substantial rights were actually prejudiced. *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). "[A] judgment may only be reversed for prosecutorial misconduct when the improper conduct deprives the defendant of a fair trial." *State v. Knight*, 9th Dist. Lorain No. 03CA008239, 2004-Ohio-1227, ¶ 6, citing *State v. Carter*, 72 Ohio St.3d 545, 557 (1995).

**{¶20}** Much of Haywood's argument is premised on his assertion that the State "fabricated" allegations of judicial bias in this matter. We note that our review of his argument is somewhat hampered because we lack jurisdiction "'to determine a claim that a common pleas judge is biased or prejudiced.'" *Wilburn v. Wilburn*, 169 Ohio App.3d 415, 2006-Ohio-5820, ¶ 10 (9th Dist.), quoting *Jones v. Billingham*, 105 Ohio App.3d 8, 11 (2d Dist.1995). As noted below, the authority to make that determination rests exclusively with the Chief Justice. *See State v. O'Neal*, 9th Dist. Medina No. 06CA0056-M, 2008-Ohio-1325, ¶ 15. This Court, therefore, cannot determine whether the first trial judge in this matter was, in fact, biased. Our review is limited to a determination of whether the State engaged in misconduct when it asked the first trial judge not to impanel the jury, filed an affidavit of disqualification, and later moved to quash the jury.

**{¶21}** The record does not support Haywood's assertion that the State's actions amounted to an attempt to manipulate the proceedings. Regardless of whether the first trial judge was actually biased, the conduct underlying the State's allegations against her is a matter of record. There is no evidence that the State accused the first trial judge of conduct that she did not, in fact, commit. Nor is there evidence that the State's actions amounted to tactical scheming. For instance, the State did not seek repeated continuances, wait until the trial had

progressed to seek the judge's removal, file and dismiss one or more affidavits of disqualification, or change its position once the first trial judge recused herself. The State requested a single, brief continuance at the conclusion of voir dire, filed its affidavit of disqualification the very next day, and pursued the matter with the second trial judge after the first judge's recusal. The State's actions, in and of themselves, do not warrant a finding of misconduct. Accordingly, we must conclude that Haywood's prosecutorial misconduct argument lacks merit.

{¶22} Finally, we cannot conclude that the second trial judge abused his discretion when he quashed the first jury and essentially entered a mistrial in this matter. *See Sutton*, 1992 Ohio App. LEXIS 2916, at *6. As noted, "'[a] defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments.'" *Glover*, 35 Ohio St.3d at 19, quoting *Wade*, 336 U.S. at 689. The second trial judge was in the best position to determine that these proceedings were "so potentially clouded in error" that a fair trial before the first jury would have been impossible. *See Glover* at 19. Although Haywood claims that the second trial judge failed to consider reasonable alternatives before announcing his decision, the record reflects that the judge spoke with the parties about other alternatives before issuing his ruling. Indeed, the judge specifically inquired why it would not be sufficient to simply strike Juror 18 from the panel and replace him with one of the alternates. The State responded in writing and explained in detail how the first judge's ruling affected the use of its peremptory challenges and caused it to augment its strategy in the selection process. In choosing not to either reconfirm Juror 18 or replace him with an alternate, the second trial judge avoided serious questions about the effects of the first trial judge's rulings. "The trial court, in its discretion, could properly dismiss the venire and, on the

facts of this case, we find no abuse in the trial court's exercise of that discretion." *Sutton* at *7. Further, we reject Haywood's contention that the lower court's actions offended his Double Jeopardy rights. Because the first jury was never sworn in, Haywood's Double Jeopardy rights had not yet attached when the second trial judge dismissed the venire and ordered a retrial. *See Gustafson*, 76 Ohio St.3d at 435; *Sutton* at *8. As such, Haywood's first, second, and third assignments of error are overruled.

## ASSIGNMENT OF ERROR IV

**THE VOLUNTARY JUDICIAL RECUSAL WAS AN ABUSE OF DISCRETION.**

**{¶23}** In his fourth assignment of error, Haywood argues that the first trial judge in this matter abused her discretion when she voluntarily recused herself from the proceedings following allegations of bias. This Court, however, "is without authority to review a matter involving the disqualification of a judge." *O'Neal*, 2008-Ohio-1325, at ¶ 15. "Matters of disqualification of trial judges lie within the exclusive jurisdiction of the chief justice of the Supreme Court of Ohio and [her] designees." *Id. Accord Dennie v. Hurst Const., Inc.*, 9th Dist. Lorain No. 06CA009055, 2008-Ohio-6350, ¶ 15-16; *State v. Smith*, 9th Dist. Lorain No. 98CA007169, 2000 Ohio App. LEXIS, *7 (Mar. 15, 2000) (court of appeals lacks authority to review recusal decisions). Consequently, this Court cannot address the merits of Haywood's fourth assignment of error.

## ASSIGNMENT OF ERROR VI

**DESHANON HAYWOOD'S CONSTITUTIONAL RIGHTS TO COUNSEL AND AGAINST SELF-INCRIMINATION WERE VIOLATED WHEN THE TRIAL COURT ADMITTED HIS IN CUSTODY, NON-*MIRANDIZED* STATEMENTS.**

**{¶24}** In his sixth assignment of error, Haywood argues that the trial court erred when it refused to suppress statements he made to the police in the absence of *Miranda* warnings. For the reasons that follow, we reject his argument.

**{¶25}** It is undisputed that, early in their investigation, the police identified Haywood as a person of interest and interviewed him while he was in jail on an unrelated matter. At no point during the interview did the police Mirandize him. According to Haywood, his rights were violated when the trial court admitted his "in custody, non-*Mirandized* statements." Yet, he "has not identified the statements which he believes were obtained in violation of his rights and has not pointed to the portions of the record on which [his] assignment of error is based." *State v. Tuck*, 146 Ohio App.3d 505, 510 (9th Dist.2001). His brief only addresses the question of custodial interrogation; not any prejudice that ensued as a result of his having made certain, inculpatory statements. Because Haywood has not pointed this Court to any inculpatory statements or explained how the court's ruling prejudiced him, this Court will not address his argument that he was subjected to custodial interrogation. *See State v. Jenkins*, 9th Dist. Lorain No. 15CA010826, 2016-Ohio-5190, ¶ 14; *Tuck* at 510. Haywood's sixth assignment of error is overruled.

## ASSIGNMENT OF ERROR V

> THE TRIAL COURT ERRED IN DENYING DESHANON HAYWOOD'S CRIM.R. 29 MOTION FOR ACQUITTAL, AND VIOLATED HIS DUE-PROCESS AND FAIR-TRIAL RIGHTS WHEN IT ENTERED CONVICTIONS IN THE ABSENCE OF SUFFICIENT EVIDENCE.

**{¶26}** In his fifth assignment of error, Haywood argues that the trial court erred by denying his Crim.R. 29 motion for acquittal because his convictions are based on insufficient evidence. Specifically, he argues that his mere presence at the scene of the crime was

insufficient to establish his complicity. We do not agree that the trial court erred by denying his motion.

{¶27} Crim.R. 29(A) provides, in relevant part:

> The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment * * * if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case.

When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the prosecution to determine whether the evidence before the trial court was sufficient to sustain a conviction. *State v. Jenks*, 61 Ohio St.3d 259, 279 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus.

{¶28} Relevant to this appeal, a person commits aggravated felony murder when he "purposely cause[s] the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, * * * aggravated robbery, * * * [or] aggravated burglary * * *." R.C. 2903.01(B). A person commits kidnapping when he, "by force, threat, or deception, * * * remove[s] another from the place where the other person is found or restrain[s] [that person's] liberty * * * [t]o facilitate the commission of any felony or flight thereafter * * * [or] [t]o terrorize, or to inflict serious physical harm on the victim or another * * *." R.C. 2905.01(A)(2), (3). A person commits aggravated robbery when he, in attempting or committing a theft offense, either (1) "[has] a deadly weapon

on or about [his] person or under [his] control and either display[s] the weapon, brandish[es] it, indicate[s] that [he] possesses it, or use[s] it"; or (2) "[i]nflict[s], or attempt[s] to inflict, serious physical harm on another." R.C. 2911.01(A)(1), (3). A person commits aggravated burglary when he,

> by force, stealth, or deception, [] trespass[es] in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if * * * [t]he offender inflicts, or attempts or threatens to inflict physical harm on another; [or] * * * has a deadly weapon or dangerous ordnance on or about [his] person or under [his] control.

R.C. 2911.11(A)(1), (2).

{¶29} "[A] defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission * * *." *State v. Herring*, 94 Ohio St.3d 246, 251 (2002). For a person to be convicted of complicity by aiding and abetting another in a crime, "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime * * *." *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. "The criminal intent of the aider and abettor 'can be inferred from the presence, companionship, and conduct of the defendant before and after the offense is committed.'" *State v. Smith*, 9th Dist. Summit No. 25650, 2012-Ohio-794, ¶ 7, quoting *In re T.K.*, 109 Ohio St.3d 512, 2006-Ohio-3056, ¶ 13. "As with proof of any element of an offense, complicity may be proved by circumstantial evidence, which has the same probative value as direct evidence." *Smith* at ¶ 7.

{¶30} I.L. testified that he was good friends with R.R., one of the victims in this matter, and that R.R. went by the nickname "Dutch." R.R. lived in a townhouse-style apartment on Kimlyn Circle along with his girlfriend K.W., another one of the victims in this matter. I.L. testified that he went to the apartment on the evening of April 17, 2013, to spend time with R.R.

and several other individuals, one of whom was a man named A.T. I.L. acknowledged that he was a heroin dealer at the time and that, while at R.R.'s apartment, he made arrangements to purchase 100 grams of heroin from a third party in a nearby parking lot. I.L. testified that R.R. knew about the transaction and was also a heroin dealer. Before leaving R.R.'s apartment that evening, I.L. divided the heroin and gave 30 grams of it to R.R. to sell.

{¶31} I.L. testified that R.R. was enjoying increasing success as a dealer around the time of his murder. Though I.L. supplied R.R. with a sizeable amount of heroin, he stated that R.R.'s increasing success caused him concern because he feared that someone might try to rob R.R. I.L. testified that, a few days before the murders, he gave R.R. a .40 caliber handgun for protection. Not until after R.R.'s murder did I.L. learn that R.R. was touting his success on social media. The pictures R.R. posted showed him holding substantial amounts of money, and at least one depicted him with I.L.'s handgun tucked into his waistband.

{¶32} I.L. testified that he and R.R. spoke to each other daily. When he tried to call R.R. the next day, however, someone else answered R.R.'s cell phone. I.L. then hung up and tried again, but another stranger answered. At that point, I.L. became concerned and asked his wife to drive him over to R.R.'s apartment. Once there, he found the front door to the apartment open and items strewn about inside. He stated that there were "[c]lothes, shoes, shoeboxes, [and] things everywhere" and that the apartment had not looked that way when he was there the previous evening. I.L. found a bullet casing on the floor in the living room and continued to walk around the apartment until he noticed that the door to the basement was open. He then peeked down the stairs and saw someone's leg at the bottom. In the basement, I.L. found R.R.'s body along with three other bodies. He testified that he recognized K.W. and K.D., a friend of

R.R.'s, but that he also saw the body of a female he did not recognize. Once he realized all four individuals were deceased, I.L. left the apartment and contacted the police.

{¶33} A.T. testified that he was at R.R.'s apartment on the evening of April 17th, along with I.L. and several other individuals. He acknowledged that he was a drug dealer at the time and knew that R.R. sold drugs out of his apartment. He maintained, however, that he did not see any drug transactions that evening and, at the time, did not know about the 100 grams of heroin that I.L. bought. A.T. estimated that he spent about an hour or less at R.R.'s apartment before he decided to drive to a nearby dancing club for a few drinks. He testified that he went by himself and stayed for a drink or two before leaving and driving to a different dancing club down the street. He stated that both K.W. and M.N. worked as dancers at the second club and happened to be there that evening.

{¶34} While at the second club, A.T. saw K.R.W., another friend whom he had not seen for some time. He testified that he and K.R.W. shared a few drinks over the course of an hour and that K.W. and M.N. joined them. Eventually, the four decided to go to a restaurant together. A.T. testified that he drove the two women while K.R.W. rode separately in a cab. The group went to a restaurant in Akron where they shared a meal. They paid their bill at 1:40 a.m. on April 18th, as evidenced by a timestamped photograph the State procured from the security footage at the restaurant. After they did so, A.T. drove all four of them to M.N.'s apartment in East Akron.

{¶35} A.T. testified that although K.W. was R.R.'s girlfriend he also had a sexual relationship with her. He testified that, after they arrived at M.N.'s apartment and relaxed a bit, he had sex with K.W. while K.R.W. had sex with M.N. Afterwards, the group relaxed a bit more before A.T. decided to leave. A.T. testified that he offered to drive K.W. home and that she

convinced M.N. to come with her. He stated that he was very intoxicated and tired, but drove K.R.W. to a nearby store parking lot to meet his cab before driving both girls back to Kimlyn Circle. A.T. watched as the girls exited the car and approached R.R.'s front door, but left before they went inside. From there, A.T. drove back to his home in Chapel Hill.

{¶36} Not long after A.T. arrived home, K.W. called his cell phone. He testified that K.W. wanted him to drive back to R.R.'s apartment because she and M.N. could not get inside. A.T. did not leave his home, but spoke with K.W. twice more on the phone. He testified that K.W. described not being able to get inside because Dutch (i.e., R.R.) was "playing" and "act[ing] like he [could not] open the door." The State then asked A.T. whether he had previously testified under oath that it was either Dutch or "Dougie" that K.W. said she saw inside. A.T. eventually agreed that he had testified to that effect, and numerous other witnesses identified Haywood as "Dougie." The State produced evidence that the phone calls between A.T. and K.W. took place at 3:37 a.m., 3:40 a.m., and 3:46 a.m. on April 18th.

{¶37} K.R.W. also testified at trial and confirmed that he spent the evening of April 17th and the early morning hours of April 18th with A.T., K.W., and M.N. Much like A.T., he described how the group unexpectedly met at a dancing club before eating together at a restaurant and going to M.N.'s apartment. He confirmed that he had sex with M.N. at her apartment while A.T. had sex with K.W. He also confirmed that A.T. and the women later dropped him off to meet his cab. K.R.W. testified that he did not speak with A.T. again until the next day when A.T. called. On the phone, A.T. told him that "everybody was dead; they killed the girls and [R.R.] and [K.D.]." A.T. also later told K.R.W. that he had spoken with K.W. after driving her to R.R.'s apartment. According to K.R.W., A.T. told him that K.W. "said she seen either Dutch or Dougie running around" inside the apartment. He specified that he spoke with

A.T. several times on the phone and at least once A.T. said it was Dutch, but another time he said it was Dougie that K.W. saw inside. Additionally, K.R.W. testified that both he and A.T. knew about the 100 grams of heroin that had been delivered to R.R.'s apartment the previous evening.

{¶38} The State set forth evidence that Haywood called a man named D.W. during the late evening hours of April 17th and the early morning hours of April 18th. D.W. testified that he was very close with Haywood and also a blood relative of Haywood's significant other. He stated that he was at home when Haywood called and asked him to follow Haywood to an undisclosed location. D.W. acknowledged that he was a drug dealer at the time and that it was not unusual for him to accompany Haywood on trips. He also acknowledged that the car he was driving at the time was not his own, but belonged to a drug user who had loaned it to him in exchange for heroin. D.W. testified that Haywood arrived at his house not long after his phone call and had Brantley in the passenger's seat of his car. D.W. confirmed that he had known Brantley for a long time and was aware that he had a reputation for being a "hothead" as well as for carrying a gun. After Haywood and Brantley arrived, the three departed, with D.W. following behind Haywood's car. D.W. testified that he ultimately parked on Gurley Avenue at Brantley's direction.

{¶39} D.W. testified that he parked his car towards Kimlyn Circle and waited there for a long time while Brantley and Haywood left on foot. During that time, D.W. made and received several phone calls and text messages. The State produced D.W.'s phone records as part of its case-in-chief and the records show that D.W.: (1) received calls from Haywood's cell phone at 12:11 a.m. and 1:42 a.m.; (2) called Haywood's cell phone at 1:27 a.m., 2:45 a.m., and 2:47 a.m.; (3) received multiple messages and calls from Haywood's significant other between 11:47 p.m. and 2:46 a.m.; (4) received phone calls from two different cell phone numbers linked to Brantley

at 2:52 a.m., 3:57 a.m., and 4:12 a.m.; and (5) called one of Brantley's cell phones at 4:15 a.m. and the other at 4:57 a.m. and 6:08 a.m. Detective Robert Moledor, a cellular analysis expert for the State, testified that the calls D.W. made or received between 1:42 a.m. and 4:57 a.m. were all routed through a cell phone tower that serviced the area around R.R.'s apartment. Meanwhile, the call he placed at 6:08 a.m. was routed through a tower that serviced the area around his home.

{¶40} D.W. testified that his cousin, Haywood's significant other, called him several times that evening because she was trying to locate Haywood. He stated that he attempted to call Haywood to tell him that she was looking for him, but never actually succeeded in reaching Haywood when he called. Meanwhile, he indicated that he spoke with Brantley because Brantley called to check that he was still parked outside. D.W. testified that he could not recall speaking with Brantley more than once, although his phone records showed multiple calls between his and Brantley's cell phones.

{¶41} D.W. stated that he eventually saw Haywood and Brantley making their way back to his car at a "fast pace walk." He could not recall what time they returned, but stated that the sun had not yet risen. Once they reached D.W.'s car, Brantley sat down in the front passenger's seat and Haywood sat down in the back. D.W. noticed that Brantley was carrying a bag containing a white substance and was attempting to cover the bag with a t-shirt. The appearance of the substance was consistent with heroin or possibly cocaine, and D.W. estimated that the amount he saw would be worth a few thousand dollars. According to D.W., after Brantley was seated inside the car, he stated that he had "double back[ed]" to "make sure the people was dead" and that he would "take it to his grave." D.W. testified that neither he, nor Haywood responded

to Brantley's statements. D.W. then dropped off Haywood and Brantley at a nearby bar and drove home.

{¶42} The State produced a significant amount of testimony in this case from analysts who examined the cell phone records of Haywood, the victims, and many of the individuals who testified. Detective Guy Sheffield examined R.R.'s cell phone and testified that Haywood's cell phone number was saved in its contacts list. He stated that R.R.'s cell phone contained instant messages to and from Haywood's cell phone, dating from February 2013 through April 2013. Within those messages, the two made plans to meet at R.R.'s apartment on Kimlyn Circle and discussed various drug transactions. Detective Sheffield testified that the last stored contact between the two phones took place on April 18th when Haywood's phone called R.R.'s phone at 1:10 a.m.

{¶43} Detective Moledor examined Haywood's cell phone records for content as well as to plot the general location of the phone at the times various calls were either made or received. He testified that calls Haywood's phone made at 1:47 a.m. and 5:01 a.m. were routed through a cell phone tower that served the area around R.R.'s apartment. In between that time period, Haywood's phone received multiple calls and text messages, but the phone was turned off. Detective Moledor was able to conclude the phone was off because it did not download all of the text messages it received during that timeframe until 5:02 a.m., meaning that the device was turned back on at that point. Though Haywood's phone was turned off during that time frame, Moledor testified that he received two particular messages of interest. The first message, sent at 2:10 a.m. from Brantley's phone, read: "kill both these n**gas." The second message, sent at 2:48 a.m. from Brantley's phone read: "I'm bout to shoot Dutch go get da s*** and then I'm gonna kill both des n**gas but u got to hurry up so we can get up out of here."

{¶44} The State produced evidence that Haywood's significant other attempted to contact him 18 times between 1:14 a.m. and 3:27 a.m. on April 18th. Detective Moledor read Haywood's significant other's text messages at trial, all of which expressed her increasing frustration at her inability to locate or hear from Haywood. Detective Moledor testified that Haywood did not respond to the messages until the following afternoon, beginning at 12:17 p.m. At that point, Haywood sent several messages in which he apologized for not being available the previous evening. One of the messages read: "I know you're mad but * * * I wasn't doing you wrong in no way besides not telling I was gone B out that late I wasnt out enjoying myself * * *."

{¶45} Detective Moledor also examined Brantley's cell phones as part of his investigation. He testified that calls Brantley's phones made between 1:49 a.m. and 4:15 a.m. were routed through a cell phone tower that served the area around R.R.'s apartment. He confirmed that several of those calls were made to or received from the phone number associated with D.W. He also noted that one of the calls that appeared in Brantley's phone records, which occurred at 2:54 a.m., took place between Brantley's two cell phones. That is, one of the cell phones called the other cell phone. Detective Moledor testified that Brantley received a call from Haywood's cell phone at 5:01 a.m. and that call evidenced the fact that Brantley's phone was no longer located in the area of the crime scene. He further testified that, later that same day, Brantley's cell phone received a picture message from Haywood's cell phone. The picture was a screen shot image of an Akron Beacon Journal article about the murders.

{¶46} Dr. Dorothy Dean, the Deputy Medical Examiner for Summit County, autopsied all four of the victims in this matter. She testified that the victims suffered from a number of gunshot wounds, but did not have any other visible injuries. Dr. Dean estimated that the victims

died approximately 10 to 12 hours before investigators came on scene, placing their estimated times of death between 2:00 a.m. and 4:00 a.m. on the morning of April 18th. She testified that each of the victims had been shot in the head and that K.W., R.R., and K.D. also had other gunshot wounds. Specifically, K.W. had two other wounds, R.R. had three other wounds, and K.D. had eight other wounds. Dr. Dean was unable to determine the order of the shots or the position of the victims at the time they were shot. She testified that several of the bodies contained bullet fragments or loose bullets, so she collected those in her examination and provided them to law enforcement. A firearms analyst later testified that at least two guns were used to kill the victims. He specified that he examined nine .40 caliber casings that were all fired from the same gun and three .9 millimeter casings that were all fired from a second gun. There is no dispute that the police did not find any guns at the crime scene, including the .40 caliber gun that I.L. gave to R.R. a few days before his murder.

{¶47} Detective Anna Romito, a member of the crime scene unit, testified regarding certain items that the police found at R.R.'s apartment. A shoebox that was located near the basement door contained a small baggy with 1.32 grams of heroin inside it. Another shoebox that the police found on the kitchen counter contained a digital scale and small paring knife while a sandwich bag box that the police found nearby contained a small baggy with .98 grams of heroin inside it. Detective Romito testified that the cabinets in the kitchen were found open and the counter was littered with a variety of items. She stated that other items were also strewn about the apartment and its appearance was consistent with the appearance of burglarized homes she had seen throughout her career. She testified that the police were able to find a fingerprint on the shoebox from the kitchen counter, and a forensic analyst later testified that the fingerprint matched Haywood's left thumbprint.

{¶48} Lieutenant David Whiddon was in charge of the murder investigation here and testified that the police initially interviewed Haywood a few days after the murders because they learned that he was the last person to call R.R. on his cell phone before his murder. At the time, Haywood was serving a few days in jail on an unrelated matter, so the police had him transported to the police station for his interview. During the interview, Haywood indicated that the last time he had been at R.R.'s apartment was perhaps the weekend before the murders occurred. He denied that he was at the apartment on April 17th or April 18th. When the police pressed him for information about who might have committed the murders or who might know something about the murders, Haywood supplied them with A.T.'s nickname and the nickname of a third individual. He never drew their attention to Brantley as a possible culprit. Nevertheless, the State produced evidence that Haywood quickly made attempts to reach Brantley once back at the jail.

{¶49} The State produced evidence that Haywood called his significant other from jail after his interview and that she reached out to Brantley that same afternoon. Haywood's significant other sent Brantley several instant messages that read: (1) "Dougie told me to call you. Where my baby?? I DON'T appreciate you ignoring me"; (2) "We got to talk"; and (3) "Now they got [R.R.'s] phone?? Your number in there." When Haywood finally spoke with Brantley later that evening he informed him that he had been interviewed about the murders. During the conversation, Brantley specifically asked Haywood where his cell phone was.

{¶50} Viewing all of the evidence in a light most favorable to the State, we must conclude that the State set forth evidence from which a rational trier of fact could have concluded that Haywood aided and abetted Brantley in the murders of R.R., K.W., and M.N. and in the other charges associated with their murders. *See Jenks*, 61 Ohio St.3d at 279. The State

set forth evidence that Haywood and Brantley were together at the time of the murders and spent several hours in the area encompassing the crime scene. There was evidence that another drug dealer had received a large heroin shipment there the previous evening and had split the shipment with R.R. There also was evidence that multiple people knew about the shipment and that R.R.'s apartment was in a state of disarray, consistent with ransacking, when the police arrived. The police found Haywood's thumbprint on a shoebox in the kitchen, amidst open cabinet doors and other items strewn about the counter. Additionally, phone records showed that Haywood was the last person to call R.R. at 1:10 a.m. An hour later, Brantley sent Haywood a text message reading "kill both these n**gas" and a later message instructing Haywood to "go get da s***" while he shot R.R. A rational trier of fact could have concluded that Haywood was not only present at R.R.'s apartment at the time of the murders, but "supported, assisted, encouraged, cooperated with, advised, or incited [Brantley] in the commission of the crime * * *." *Johnson*, 93 Ohio St.3d 240 at syllabus. Accordingly, Haywood's fifth assignment of error is overruled.

## ASSIGNMENT OF ERROR IX

THE TRIAL COURT ERRED AND VIOLATED DESHANON HAYWOOD'S DUE-PROCESS AND FAIR-TRIAL RIGHTS WHEN IT ENTERED CONVICTIONS THAT WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶51} In his ninth assignment of error, Haywood argues that his convictions are against the manifest weight of the evidence. His brief cites to the manifest weight standard and then simply asks this Court to review "[t]he framework of the evidence and verdicts described in the [sufficiency] assignment of error" under that standard. Yet, "sufficiency and manifest weight are two separate, legally distinct arguments." *State v. Vicente-Colon*, 9th Dist. Lorain No. 09CA009705, 2010-Ohio-6242, ¶ 20. Beyond making a blanket statement that his convictions

are against the manifest weight of the evidence, Haywood has not "challenged any of the evidence the State set forth as 'unreliable or lacking credibility.'" *State v. Jackson*, 9th Dist. Summit No. 28192, 2017-Ohio-635, ¶ 14, quoting *State v. Smith*, 9th Dist. Summit No. 27877, 2016-Ohio-7278, ¶ 16. This Court will not develop a manifest weight argument on his behalf. *See State v. Sadeghi*, 9th Dist. Wayne No. 14AP0051, 2016-Ohio-744, ¶ 32. Haywood has not shown that this is the exceptional case where the trier of fact lost its way in convicting him. *See id.* at ¶ 33. Thus, his ninth assignment of error is overruled.

## ASSIGNMENT OF ERROR VIII

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ADMITTED INADMISSIBLE HEARSAY TESTIMONY AND PERMITTED IMPROPER IMPEACHMENT RELATED TO THAT TESTIMONY.

{¶52} In his eighth assignment of error, Haywood argues that the trial court abused its discretion when it admitted certain statements that K.W. made while on the phone with A.T. He asserts that the statements were improperly admitted because they amounted to hearsay and were elicited only after the State impeached its own witness. For the reasons that follow, we reject Haywood's eighth assignment of error.

{¶53} The decision to admit or exclude evidence lies in the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 180 (1987). "Absent an issue of law, this Court, therefore, reviews the trial court's decision regarding evidentiary matters under an abuse of discretion standard of review." *State v. Aguirre*, 9th Dist. Lorain No. 13CA010418, 2015-Ohio-922, ¶ 6. An abuse of discretion indicates that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, this Court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

**{¶54}** At trial, A.T. testified that he spoke with K.W. on the phone after leaving her at R.R.'s apartment. As previously noted, K.W. called A.T. because she could not get inside the apartment. A.T. testified that K.W. described not being able to get inside because Dutch (i.e., R.R.) was "playing" and "act[ing] like he [could not] open the door." The State then asked A.T. whether he had previously testified under oath that it was either Dutch or "Dougie" that K.W. said she saw inside. A.T. eventually agreed that he had testified to that effect, but also stated that he could no longer remember what name K.W. said and that he was intoxicated and very tired when he spoke with K.W.

**{¶55}** The trial court admitted K.W.'s statements through A.T. as a present sense impression and allowed the State to confront A.T. with his previous testimony on the basis of surprise. Haywood argues that K.W.'s statements did not meet the requirements for the present sense impression exception because the circumstances under which they were made "indicate[d] [a] lack of trustworthiness." Evid.R. 803(1). According to Haywood, because A.T. admitted that he was intoxicated and very tired when he spoke with K.W., his recollection of her alleged statements was untrustworthy. He also argues that the State should not have been allowed to impeach A.T. under Evid.R. 607.

**{¶56}** We begin by addressing Haywood's assertion that the trial court erred when it allowed the State to impeach A.T. with his former testimony. Evid.R. 607(A) allows a party to confront his own witness with a prior inconsistent statement for the purpose of attacking the witness' credibility "only upon a showing of surprise and affirmative damage." The rule does not apply, however, when the calling party introduces the prior statement as substantive evidence (i.e., for the purpose of proving the truth of the matter asserted therein) rather than for impeachment purposes. *See State v. Stover*, 9th Dist. Wayne No. 13CA0035, 2014-Ohio-2572, ¶

17, citing *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, ¶ 182-185. *See also* Evid.R. 607(A) (providing that the rule does not apply to statements admitted pursuant to certain hearsay exceptions). In those instances, the calling party may confront his witness with the prior statement so long as it satisfies one of the hearsay exceptions. *See Stover* at ¶ 17. *Accord State v. Hoehn*, 9th Dist. Medina No. 03CA0076-M, 2004-Ohio-1419, ¶ 30-33.

{¶57} The record reflects that the State asked A.T. about his prior testimony not to impeach his credibility, but to establish its truth. Specifically, the State sought to introduce as substantive evidence that K.W. said she saw either Dutch or Dougie inside R.R.'s apartment. Haywood has not explained Evid.R. 607(A)'s application in this instance. *See* App.R. 16(A)(7). Moreover, even assuming that the State's purpose in questioning A.T. was to impeach his credibility rather than to prove the truth of his prior statements, Haywood has made no attempt to address the elements of Evid.R. 607(A) in his brief. This Court will not construct an argument or conduct an analysis on his behalf. *See Cardone v. Cardone*, 9th Dist. Summit Nos. 18349, 18673, 1998 Ohio App. LEXIS 2028, *22 (May 6, 1998) ("If an argument exists that can support [an] assignment of error, it is not this [C]ourt's duty to root it out."). Accordingly, insofar as it pertains to improper impeachment, we reject Haywood's argument.

{¶58} One of the exceptions to the general bar against the admission of hearsay testimony is the present sense impression exception. That exception permits a party to introduce "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness." Evid.R. 803(1). "Such statements are generally held to be trustworthy because they are made at the time of, or immediately following an event without sufficient time to reflect upon the event." *State v. Williams*, 9th Dist. Lorain No. 09CA009679, 2010-Ohio-3667, ¶ 28.

{¶59} Haywood argues that A.T.'s statements were not admissible under the present sense of impression exception because A.T. admitted that he was intoxicated and very tired when he spoke with K.W. Given A.T.'s admission to that effect, Haywood argues that the "circumstances indicate lack of trustworthiness," and the State could not rely on Evid.R. 803(1). Evid.R. 803(1). In so arguing, Haywood misunderstands the application of the rule in this instance. A.T.'s prior statement was not subject to the present sense impression requirements. Rather, it was admissible as a prior statement by a witness. *See* Evid.R. 801(D)(1). Evid.R. 803(1) only applied to K.W.'s statement to A.T., so any questions about the circumstances of *his* trustworthiness were irrelevant to the issue of whether her statement satisfied the hearsay exception. Any questions Haywood had about A.T.'s trustworthiness or ability to accurately recall K.W.'s statements were questions of weight, rather than admissibility.

{¶60} Although the trial court based its decision to admit A.T.'s prior statement on other grounds, "this Court may affirm [a trial court's] ultimate decision on other legally correct grounds." *State v. Calise*, 9th Dist. Summit No. 26027, 2012-Ohio-4797, ¶ 42. Upon review, we cannot conclude that the court erred when it admitted the testimony at issue here. Accordingly, Haywood's eighth assignment of error is overruled.

## ASSIGNMENT OF ERROR VII

PROSECUTORIAL MISCONDUCT DEPRIVED DESHANON HAYWOOD
OF HIS DUE-PROCESS AND FAIR-TRIAL RIGHTS.

{¶61} In his seventh assignment of error, Haywood argues that prosecutorial misconduct deprived him of a fair trial. We disagree.

{¶62} As previously noted, in deciding whether a prosecutor's conduct rises to the level of prosecutorial misconduct, a court determines if the prosecutor's actions were improper, and, if so, whether the defendant's substantial rights were actually prejudiced. *Smith*, 14 Ohio St.3d at

14. "[A] judgment may only be reversed for prosecutorial misconduct when the improper conduct deprives the defendant of a fair trial." *Knight*, 2004-Ohio-1227, at ¶ 6, citing *Carter*, 72 Ohio St.3d at 557. The defendant must show that, but for the prosecutor's misconduct, the trier of fact would not have convicted him. *State v. Lollis*, 9th Dist. Summit No. 24826, 2010-Ohio-4457, ¶ 24. "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 140, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

{¶63} Haywood alleges two instances of prosecutorial misconduct. First, he argues that the prosecutor engaged in misconduct when he repeatedly relied on Haywood's post-*Miranda* silence to attack his credibility. Second, he argues that he was denied a fair trial because "this record demonstrates that the final-trial jury observed many indications that there had been previous official proceedings, if not previous trials." We address Haywood's second contention first.

{¶64} There is no evidence in the record that the jury here learned about Haywood's prior trial as a result of any misconduct on the part of the State. It is undisputed that Haywood had more than one trial in this matter and that the majority of the witnesses who testified against him testified at his prior trial. The question of how to refer to his prior trial was an issue that the trial court raised before opening statements. When the court proposed referring to the earlier trial as a hearing that occurred under oath, defense counsel responded that it was "significant," for purposes of impeachment, to be able to stress to the jury that certain witnesses had potentially "lie[d] in front of a judge and a jury under oath * * *." Defense counsel then objected when the court ruled that the first trial should be called a prior hearing under oath rather than a trial. Moreover, defense counsel (1) was the first to broach the subject of the prior trial in opening

statements, noting that one of the witnesses had "given testimony under oath in a prior hearing"; (2) was the first to ask a witness about the prior proceedings on cross-examination, inquiring whether the witness recalled having "testified in this case already" under oath; and (3) repeatedly relied on testimony given at the first trial as an impeachment tool on cross-examination. Haywood has not shown that the jury learned of his prior trial as a result of prosecutorial misconduct. Further, given defense counsel's actions in the court below, Haywood cannot now argue that any references the State made to the prior proceeding in this matter deprived him of a fair trial. We reject Haywood's argument to the contrary.

{¶65} Next, we address Haywood's contention that the prosecutor improperly commented on his right to remain silent. Haywood testified in his own defense at trial. It was his testimony that he was present at R.R.'s apartment when the murders occurred, but that it was Brantley who committed the murders. While testifying, he admitted that he had an interview with the police a few days after the murders and repeatedly lied and provided the detectives with false leads. He testified that he did not go to the police right after the murders because he was scared and "thinking [he would] get in trouble just for being there * * *." He also testified that he misled the police during his interview because he was afraid how Brantley might react if he thought he had cooperated.

{¶66} On cross-examination, the State asked Haywood whether, when he testified on direct examination, it was the first time anyone in law enforcement had heard the version of events that he described. Haywood agreed that it was the first time and, while he had the opportunity to tell the police the true story, he did not. The State asked Haywood multiple questions about whether, before testifying, he had the benefit of hearing the testimony in prior proceedings, reading the transcript in Brantley's trial, and hearing the State set out its accomplice

liability theory. Additionally, the State asked Haywood whether "[f]or two years now, * * * [he] [had] allowed people to accuse [A.T.] of being a murderer[.]" The State also referenced in closing argument the fact that Haywood had lied to the police, had waited more than two years to tell his story, and had only told his story with the benefit of having heard the testimony in the prior proceedings.

{¶67} Even assuming that, at some point, the State's questions or argument went beyond proper impeachment and amounted to improper comment on Haywood's right to remain silent, the record reflects that the prosecutor's improper argument constituted harmless error beyond a reasonable doubt. *See State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶ 162. Haywood was convicted as an accomplice, not the principal offender, and, by his own testimony, he was with Brantley at R.R.'s apartment when the victims were murdered. Although he claimed that he was merely present at the apartment and not directly involved in the crimes that occurred there, the State produced a significant amount of circumstantial evidence to the contrary. The State produced evidence that the apartment had been ransacked and that Haywood's thumbprint was on one of the items strewn about the kitchen counter. The State also produced evidence that, at the estimated time of the murders, Haywood received text messages from Brantley reading: "kill both these n**gas" and "I'm bout to shoot Dutch go get da s*** and then I'm gonna kill both des n**gas but u got to hurry up so we can get up out of here." Having carefully reviewed the record and all of the evidence in this matter, we cannot conclude that Haywood was materially prejudiced by the prosecutor's misconduct, if any, as there was overwhelming evidence of his guilt. *See, e.g., State v. Dalton*, 9th Dist. Summit No. 17659, 1996 Ohio App. LEXIS 5124, *17 (Nov. 20, 1996). As such, his seventh assignment of error is overruled.

## ASSIGNMENT OF ERROR X

THE TRIAL COURT VIOLATED DESHANON HAYWOOD'S DUE-PROCESS AND FAIR-TRIAL RIGHTS THROUGH CUMULATIVE ERROR.

**{¶68}** In his tenth assignment of error, Haywood argues that cumulative errors deprived him of a fair trial. Yet, cumulative error exists only where the errors during trial actually "deprive[d] a defendant of the constitutional right to a fair trial." *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus. "'[T]here can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial.'" *State v. Hill*, 75 Ohio St.3d 195, 212 (1996), quoting *United States v. Hasting*, 461 U.S. 499, 508-509 (1983). To support a claim of cumulative error, there must be multiple instances of harmless error. *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). "Because this Court did not find multiple instances of error, the cumulative error doctrine does not apply." *State v. Jamison*, 9th Dist. Summit No. 27664, 2016-Ohio-5122, ¶ 40. Haywood's tenth assignment of error is overruled.

### III.

**{¶69}** Haywood's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

––––––

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
DONNA J. CARR
FOR THE COURT

HENSAL, P. J.
SCHAFER, J.
CONCUR.

APPEARANCES:

TIMOTHY YOUNG, Public Defender, and PETER GALYARDT, Assistant Public Defender, for Appellant.

TIMOTHY J. MCGINTY, Prosecuting Attorney, and MAHMOUD AWADALLAH, BRIAN RADIGAN, and ANTHONY T. MIRANDA, Assistant Prosecuting Attorneys, for Appellee.