[Cite as *State v. Gilbert*, 2025-Ohio-4623.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| STATE OF OHIO | | C.A. No. 23CA012031 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| STEVEN GILBERT | | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | | CASE Nos. 21CR105451 |
| | | 21CR105037 |

DECISION AND JOURNAL ENTRY

Dated: October 6, 2025

FLAGG LANZINGER, Presiding Judge.

{¶1} Defendant-Appellant, Steven Gilbert, appeals from the judgment of the Lorain County Court of Common Pleas. This Court affirms.

I.

{¶2} The police investigated and identified Mr. Gilbert as a human trafficker. Evidence showed that he operated a human trafficking ring out of Elyria and surrounding areas for several years. He was indicted in three separate criminal cases. He resolved one case by plea, and that case is not before us. In Criminal Case No. 21CR105037, he was indicted on one count of rape, two counts of having weapons under disability, and one count of promoting prostitution. His rape charge included two firearm specifications. In Criminal Case No. 21CR105451, he was indicted on fifty-four counts. That indictment included charges of engaging in a pattern of corrupt activity, rape, kidnapping, aggravated robbery, trafficking in persons, compelling prostitution, promoting prostitution, sexual battery, and money laundering. The indictment named nine victims and

included firearm specifications and specifications for the forfeiture of property, human trafficking, committing acts with sexual motivation, and being a sexually violent predator.

{¶3} The trial court consolidated Criminal Case No. 21CR105037 and Criminal Case No. 21CR105451 for trial. Several of Mr. Gilbert's charges were dismissed, and he chose to try his sexual motivation and sexually violent predator specifications to the bench. The remainder of his charges and specifications were tried to a jury. At the conclusion of trial, he was found guilty of three counts of engaging in a pattern of corrupt activity, one count of rape, three counts of kidnapping, one count of aggravated robbery, seven counts of trafficking in persons, five counts of compelling prostitution, five counts of promoting prostitution, one count of sexual battery, two counts of money laundering, and a significant number of specifications. The trial court sentenced him to serve a minimum of 189 years to life in prison. It also classified him as a tier III sexual offender.

{¶4} Mr. Gilbert now appeals from his convictions and raises eleven assignments of error for review. For ease of analysis, we consolidate and rearrange several of the assignments of error.

II.

ASSIGNMENT OF ERROR I

TRIAL COURT ERRED WHEN IT DID NOT PERMIT THE APPELLANT TO TERMINATE COUNSEL AND REPRESENT HIMSELF IN VIOLATION OF APPELLANT'S SIXTH AMENDMENT RIGHTS[.]

ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN DENYING APPELLANT-DEFENDANT'S REQUEST TO REPRESENT HIMSELF[.]

{¶5} In his first and second assignments of error, Mr. Gilbert argues the trial court erred when it refused to let him terminate his appointed attorney and represent himself at trial. For the following reasons, we reject his argument.

{¶6}   A criminal defendant has a constitutional right to counsel. U.S. Const., amend. VI; Ohio Const., art. I, § 10. Yet, no criminal defendant is guaranteed a "meaningful relationship" with his appointed counsel. *Morris v. Slappy*, 461 U.S. 1, 14 (1983). "The right to counsel must be tempered by the public's right to a prompt, orderly[,] and efficient administration of justice." *State v. Marinchek*, 9 Ohio App.3d 22, 23 (9th Dist. 1983). To secure a discharge of court-appointed counsel, a defendant must show "good cause, such as a conflict of interest, a complete breakdown of communication, or an irreconcilable conflict which leads to an apparently unjust result." (Internal quotations omitted.) *State v. Dawalt*, 2007-Ohio-2438, ¶ 15 (9th Dist.), quoting *State v. Alexander*, 2006-Ohio-1298, ¶ 15 (10th Dist.). A temporary lack of communication between a defendant and his attorney is insufficient. *State v. Ketterer*, 2006-Ohio-5283, ¶ 154. Likewise, "[d]isagreements between attorney and client over trial strategy do not warrant substitution of counsel." *State v. Conway*, 2006-Ohio-791, ¶ 150. If a criminal defendant fails to demonstrate good cause for removal, "the trial court may 'require the trial to proceed with assigned counsel participating.'" *Ketterer* at ¶ 150, quoting *State v. Deal*, 17 Ohio St.2d 17 (1969), syllabus.

{¶7}   In addition to having a constitutional right to counsel, "a criminal defendant has a constitutional right to self-representation." *State v. Perry*, 2011-Ohio-2242, ¶ 11 (9th Dist.), citing *Faretta v. California*, 422 U.S. 806, 819 (1975). A defendant "may proceed to defend himself without counsel when he voluntarily, and knowingly and intelligently elects to do so.'" *State v. Schleiger*, 2014-Ohio-3970, ¶ 18, quoting *State v. Gibson*, 45 Ohio St.2d 366 (1976), paragraph one of the syllabus. "[T]he trial court has to make a sufficient inquiry to determine whether the defendant fully understands and relinquishes [his right to counsel], which includes advising the defendant of the dangers and disadvantages of self-representation." *State v. Owens*, 2019-Ohio-2206, ¶ 8 (9th Dist.). "If a trial court denies the right to self-representation when the right has been

properly invoked, the denial is per se reversible error." *State v. Neyland*, 2014-Ohio-1914, ¶ 71. Nevertheless, "a strict standard must be applied when determining the adequacy of a criminal defendant's invocation of the right to self-representation." *Perry* at ¶ 11. "The assertion of the right . . . must be clear and unequivocal . . . [and] may be denied when circumstances indicate that the request is made for purposes of delay or manipulation of the trial process." *Neyland* at ¶ 72.

{¶8}  The record shows Mr. Gilbert had four attorneys throughout the course of the proceedings. His first attorney, who he retained, withdrew when it became clear that Mr. Gilbert would not be able to pay his fees. The trial court appointed Mr. Gilbert's other attorneys. His second and third attorneys withdrew because he refused to waive his speedy trial rights. The trial court discussed with him the importance of giving his attorneys time to adequately prepare for trial, but Mr. Gilbert refused to waive time. His fourth attorney ultimately convinced him to pursue pretrial motions, thereby tolling his speedy trial time. The trial court appointed the fourth attorney in December 2021.

{¶9}  The trial court originally scheduled the first of Mr. Gilbert's three criminal cases for trial in mid-June 2022. The morning of trial, his attorney informed the court that Mr. Gilbert did not want to go to trial and wanted a new attorney. The attorney indicated that, just two days earlier, he had spoken with Mr. Gilbert about the case and a plea offer from the State. At that time, Mr. Gilbert had not expressed any issue with his representation. The attorney learned of Mr. Gilbert's alleged dissatisfaction with his representation on the morning of trial. The attorney stated that, if Mr. Gilbert wanted to reject the State's offer, he was fully prepared to litigate his case. Mr. Gilbert then addressed the court.

{¶10}  Mr. Gilbert told the court that he had been wanting new counsel for over a month but had no earlier opportunity to convey that message to the court. He expressed displeasure with

his attorney's handling of the case and accused his attorney of failing to share evidence with him. The court listened to Mr. Gilbert and gave his attorney a chance to respond. Following a lengthy exchange, the court advised Mr. Gilbert that it suspected he simply did not want to go to trial. The court informed Mr. Gilbert that it would not be continuing the case or dismissing his attorney. Mr. Gilbert responded by questioning his own competency to stand trial. *See* Discussion of Assignment of Error III, *infra*. After the trial court addressed that issue, it instructed Mr. Gilbert to consult with his attorney. Mr. Gilbert ultimately pleaded guilty to the criminal case set for trial that day.

{¶11} Several months passed without issue. The trial court scheduled the matter for trial on Mr. Gilbert's remaining two criminal cases at the end of January 2023. In early November, Mr. Gilbert came before the court for a pretrial. He informed the court that he did not believe his attorney was sharing enough information with him to help him decide how to proceed. His attorney addressed that concern, noting that it was impossible for him to review every piece of evidence with Mr. Gilbert as there were "several gigs of information . . . ." The attorney also expressed his frustration that he had managed to secure the exact plea offer Mr. Gilbert had requested, only for Mr. Gilbert to reject it. Mr. Gilbert insisted that he did not remember requesting the offer or speaking with his attorney several times about the offer. He also noted that he had asked for a mental health evaluation and had never received one. Mr. Gilbert did not ask for a new attorney. Nor did he demand to represent himself.

{¶12} One month later, the court held what was to be a final pretrial. The court noted that it had received correspondence from Mr. Gilbert asking for a new attorney. Mr. Gilbert once again accused his attorney of failing to share evidence with him to help him prepare for trial. The attorney gave a detailed account of his efforts to meet with Mr. Gilbert and review the evidence

with him. He also advised the court that he was prepared and ready to go to trial. After hearing from Mr. Gilbert and the attorney, the court denied Mr. Gilbert's request for new counsel. It noted that it had appointed him three attorneys, each of whom said he was difficult to work with because his case was complex, he was uncooperative, and he was unwilling to take their advice. The court refused to appoint a fourth attorney and further delay the trial. Mr. Gilbert then stated:

> I would like to . . . still fire the counsel and represent myself, sir. If you don't want to appoint me a counsel, I could represent myself. I just need time to go over the evidence and have a fair case. Because I feel that he's not going to show up and go over the evidence . . . .

The attorney immediately responded that he already had an appointment scheduled with Mr. Gilbert for the following week. Further discussion ensued, and the court reiterated that it would not appoint new counsel or continue the trial. The pretrial concluded with the trial remaining scheduled for the end of the month.

{¶13} Eleven days before the scheduled trial date, the trial court issued a journal entry addressing several matters. The court noted that it had met with the parties by phone. It agreed to continue the trial until mid-April 2023 so Mr. Gilbert could hire an investigator to help review evidence. It also noted that Mr. Gilbert would be withdrawing his request to represent himself at trial.

{¶14} Mr. Gilbert had additional pretrials in February and March 2023. The record does not reflect that he sought to discharge his attorney during those pretrials or represent himself. Ten days before his scheduled trial date, however, Mr. Gilbert once again took issue with his attorney. The parties came before the court for a final pretrial as well as a hearing on evidence the State sought to introduce. The State sought to introduce numerous letters Mr. Gilbert wrote and numerous phone calls he made while incarcerated. The State explained how the letters and calls inculpated him. It also argued that a letter showed Mr. Gilbert had planned to feign mental health

issues to help his case. The court reserved a final admissibility ruling on the State's evidence. A lengthy discussion then ensued regarding a plea offer the State had made. After Mr. Gilbert formally rejected the offer, he asked to speak with the court about his attorney.

{¶15} Mr. Gilbert once again expressed dissatisfaction with his attorney. He argued that his attorney had not shared evidence with him and had not met with him often enough to prepare for trial. The trial court, the attorney, and Mr. Gilbert had a lengthy conversation about the attorney's efforts to summarize all the evidence for Mr. Gilbert, review the most important evidence with him, and prepare his case for trial. The court vouched for the attorney, stressed the complexity of Mr. Gilbert's case, and explained that his attorney also had other clients. The court informed Mr. Gilbert that it would take appropriate measures if it felt his attorney was unprepared at trial. Yet, it refused to delay the trial further by appointing a new attorney. Mr. Gilbert responded:

> I'd rather just excuse [my attorney] off my case and I'll counsel myself. So I need my motion for discovery, my motion for expert witness, motion for a private investigator, and I want to do a suppression hearing to suppress those letters. And I want to change my plea from not guilty to guilty by insanity.

Mr. Gilbert clarified that he felt he was insane at the time of his crimes because he was on drugs when they occurred.

{¶16} The trial court addressed Mr. Gilbert's request, noting that it felt he was trying to delay his trial further. The court acknowledged his right to act pro se if he properly waived his right to counsel. The court indicated, however, that it was not prepared to immediately hold a full hearing on that issue. The court also strongly advised Mr. Gilbert against representing himself. The court informed Mr. Gilbert that it would not continue his trial but would schedule a hearing to address his request to waive counsel. The court set the matter for a hearing on that issue three days later (i.e., seven days before trial).

{¶17} At the scheduled hearing, the trial court addressed the complexity of Mr. Gilbert's case, the potential severity of his sentence, and its confidence in the abilities of his appointed attorney. The court strongly cautioned Mr. Gilbert against representing himself, but Mr. Gilbert indicated that he wanted to act pro se. The court then allowed Mr. Gilbert's attorney and the State to make statements. The State argued that Mr. Gilbert's request to represent himself was not an unequivocal or timely one. It further argued that his complaints about his attorney were not genuine. The State called a sheriff's deputy to testify. The deputy testified that he had helped transport Mr. Gilbert from his holding cell to the courtroom three days earlier. At that time, Mr. Gilbert made statements indicating that he was "creating [the issue with his attorney] in order to create an appeal for when he's found guilty at trial." The deputy also heard Mr. Gilbert say he was going to claim that "he was hearing voices to cause harm to his attorney."

{¶18} When Mr. Gilbert addressed the court, he indicated that he felt his competence was still an issue because he still did not understand his charges. He indicated that he and his attorney argued frequently, and he did not feel that his attorney visited him enough or raised issues that he believed should be raised. Mr. Gilbert began addressing the evidence against him, and his attorney cautioned him against making statements that might damage his case. The court then allowed his attorney to consult with him privately. Following their consultation, Mr. Gilbert once again addressed the court. Mr. Gilbert informed the court that he frequently heard a voice in his head. He claimed he had been talking to himself and answering himself for a long time, and the voice had told him he should hit his attorney. A lengthy discussion ensued, during which Mr. Gilbert repeatedly accused his attorney of not sharing evidence with him. The attorney explained his continuing efforts to do so several times and reiterated that he was willing to continue representing Mr. Gilbert and prepared to go to trial. The parties discussed the evidence Mr. Gilbert still wanted

to review and the time his attorney could schedule to review that evidence. Following that discussion, the court told Mr. Gilbert it would take the matter under advisement.

{¶19} Before the hearing concluded, Mr. Gilbert stated:

> Your Honor, I got, I got one question. It's not about me representing myself like I'm not satisfied with the way [my attorney] did, but if there's a way that like my family, say they hire me an attorney, how would that work.

The trial court indicated that it would have to wait to hear from any attorney seeking to represent him, but it was "not planning at this time to contin[ue] [his] trial." Mr. Gilbert responded: "I just wanted a fair trial where I can put my whole, all into it and be as great as I can to assist the defense in the best I can . . . ."

{¶20} The trial court issued a written ruling on Mr. Gilbert's motion to represent himself. The court noted that Mr. Gilbert had raised competing arguments. On the one hand, he claimed to be able to represent himself. On the other hand, he claimed to be hearing voices and in need of a mental health evaluation. The court noted that the State had presented evidence tending to show Mr. Gilbert was fabricating his mental health issues and issues with his attorney to create arguments for appeal. The court also noted that Mr. Gilbert had expressed an interest in hiring a new attorney rather than represent himself. The court found that his request to represent himself was not unequivocal, was untimely, and, on balance, amounted to a tactic for delay. Consequently, it denied Mr. Gilbert's request to represent himself.

{¶21} Mr. Gilbert argues the trial court erred by not allowing him to terminate his appointed counsel. According to Mr. Gilbert, he moved to discharge his retained counsel multiple times over the course of nine months, but the court never ruled on those requests. He claims that he and his attorney had a complete breakdown in communication such that the attorney should have been removed. Additionally, he argues that structural error occurred when the court denied

him his right to represent himself at trial. He claims his request was unequivocal and timely because he made it "several months, several weeks, and again several days before trial." He argues that it was clear he understood the proceedings enough to proceed pro se. As such, he argues the court erred when it denied his request to terminate his attorney and represent himself.

{¶22} Upon review, Mr. Gilbert has not shown that he and his attorney experienced a complete breakdown in communication such that the trial court erred by not removing him. *See Dawalt*, 2007-Ohio-2438, at ¶ 15 (9th Dist.), quoting *Alexander*, 2006-Ohio-1298, at ¶ 15 (10th Dist.). The record shows that Mr. Gilbert expressed dissatisfaction with his attorney on several occasions but withdrew the requests he made to discharge his attorney before April 2023. To the extent the two experienced any breakdown in communication before that point, the breakdown was only temporary in nature. *See Ketterer*, 2006-Ohio-5283, at ¶ 154 (temporary lack of communication between defendant and his attorney will not justify removal of the attorney). Mr. Gilbert's final requests to remove his attorney occurred shortly before his trial. The court repeatedly expressed its concern about further delaying the trial, given that it had already been delayed several times. Moreover, the court heard evidence that Mr. Gilbert was falsely claiming to have issues with his attorney to create arguments for appeal. The record supports the conclusion that, in refusing to discharge Mr. Gilbert's attorney, the court properly balanced Mr. Gilbert's right to counsel against "the public's right to a prompt, orderly[,] and efficient administration of justice." *Marinchek*, 9 Ohio App.3d at 23 (9th Dist.). To the extent Mr. Gilbert believed his counsel was not sharing enough evidence with him or helping him strategize for trial, the trial court heard evidence that his attorney had met with Mr. Gilbert over the course of proceedings, had shared as much evidence with him as possible, and was employing his expertise to formulate a strategy for trial. Although Mr. Gilbert disagreed with his attorney's assessment, "disagreements between

attorney and client over trial strategy do not warrant substitution of counsel." *Conway*, 2006-Ohio-791, at ¶ 150. *See also State v. Cowans*, 87 Ohio St.3d 68, 73 (1999) (attorney's honest appraisal of the unlikelihood of a defendant prevailing at trial is not good cause for substitution). Upon review, Mr. Gilbert failed to demonstrate good cause for the removal of his attorney. *See Ketterer* at ¶ 150. Thus, his first assignment of error is overruled.

{¶23} Mr. Gilbert also has not shown that the court committed structural error by denying his request to represent himself. First, most of Mr. Gilbert's requests stemmed from his alleged frustrations with his attorney's performance. This Court has held that "a request [to represent oneself] is not unequivocal if it is made as an expression of frustration . . . ." *State v. Higgins*, 2018-Ohio-476, ¶ 32 (9th Dist.). Second, the record shows that Mr. Gilbert equivocated as to whether he desired to represent himself. His requests to do so were intermixed with questions about appointing and/or hiring new counsel. The Ohio Supreme Court has held that a defendant must clearly and unequivocally assert his right to self-representation. *Neyland*, 2014-Ohio-1914, at ¶ 72. Finally, there was evidence tending to show that Mr. Gilbert asked to represent himself for the purpose of delaying or manipulating the proceedings. *See id.* (request to act pro se cannot be made for the purpose of delay or manipulation). More than once, he waited until the eve of trial before claiming he had an issue with his attorney. When the court indicated that it was not inclined to delay the proceedings, Mr. Gilbert claimed he was currently incompetent and insane at the time of the offense. He waited until just before trial to claim he was hearing voices. The trial court heard a deputy testify that Mr. Gilbert admitted he intended to lie about mental health problems and his attorney to create arguments for appeal. Based on the circumstances, the trial court reasonably could have concluded that his requests to represent himself were made for the purpose

of delay or manipulation. *See id.* We cannot conclude the court erred when it denied Mr. Gilbert's requests. Accordingly, his second assignment of error is overruled.

ASSIGNMENT OF ERROR III

THE TRIAL COURT WAS INEFFECTIVE FOR FAILING TO ORDER A COMPETENCY EVALUATION AND/OR HOLD A COMPETENCY HEARING WHEN THE RECORD EVIDENCED QUESTIONS AS TO APPELLANT'S COMPETENCY[.]

{¶24} In his third assignment of error, Mr. Gilbert argues the trial court erred when it failed to hold a competency hearing and order a competency evaluation for him. We do not agree.

{¶25} "A criminal defendant is presumed competent." *State v. Coker*, 2021-Ohio-2910, ¶ 8 (9th Dist.). *See also* R.C. 2945.37(G). Nevertheless, "'a person [who] lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial.'" *State v. Skatzes*, 2004-Ohio-6391, ¶ 155, quoting *Drope v. Missouri*, 420 U.S. 162, 171 (1975).

> When a trial court is confronted with whether to order a competency evaluation sua sponte, "relevant considerations include: (1) doubts expressed by counsel as to the defendant's competence; (2) evidence of irrational behavior; (3) the defendant's demeanor at trial; and (4) prior medical opinion relating to competence to stand trial."

*State v. Tucker*, 2016-Ohio-1354, ¶ 8 (9th Dist.), quoting *State v. Rubenstein*, 40 Ohio App.3d 57, 60-61 (8th Dist. 1987). "An evidentiary competency hearing is constitutionally required whenever there are sufficient indicia of incompetency to call into doubt defendant's competency to stand trial." *State v. Were*, 94 Ohio St.3d 173 (2002), paragraph two of the syllabus.

{¶26} Mr. Gilbert argues the trial court erred by not holding a competency hearing and ordering a competency evaluation for him because "the record is flush with indicia that [his] competency was at issue." He notes that, at the pretrial stage, he questioned his own competence and requested an evaluation. He also notes that the State introduced evidence in the form of a

letter he wrote and statements he made to a deputy, both of which indicated that he planned to appear mentally unsound. While the trial court viewed that evidence as proof of his malingering, Mr. Gilbert argues "the question of whether one is malingering is a psychological analysis more appropriately reserved for the court clinic psychologist to determine." Thus, he argues a competency hearing and evaluation were necessary.

{¶27} When Mr. Gilbert first questioned his own competency, the trial court asked him why he felt that way. Mr. Gilbert responded:

> I don't know. The mental health people at the jail told me that I got a lot of issues, and that's what they told me. I don't really know what that means.
>
> . . .
>
> They just said something about competency. I wrote it down so I can remember. I don't even know what that word means, but they said I have a lot of mental health issues at the jail. And they said that I should talk to you about them . . . .

The court noted that none of Mr. Gilbert's four attorneys had expressed any concerns about his competency. Nevertheless, during a break in the proceedings, the court reviewed a case Mr. Gilbert had back in 2017 and contacted the head of the medical department at the jail. The court indicated that nothing from the 2017 case hinted at any issues with Mr. Gilbert's competency. Further, the head of the medical department at the jail told the court that medical personnel from the jail would have contacted the court directly if anyone had any concerns about Mr. Gilbert's mental health. The court noted that it had not observed any concerning behavior on the part of Mr. Gilbert that might have caused it to question his competency. Based on its research, observations, and the lack of any concerns on the part of Mr. Gilbert's attorneys or the medical staff at the jail, the trial court declined to further investigate Mr. Gilbert's suggestion of incompetence.

{¶28} Upon review, Mr. Gilbert has not shown the trial court erred by declining to order a competency evaluation and conduct a hearing. As noted, defendants are presumed competent by operation of law. *See Coker*, 2021-Ohio-2910, at ¶ 8 (9th Dist.); R.C. 2945.37(G). The record reflects that Mr. Gilbert fully participated in the proceedings and had intelligent exchanges with the court regarding his case, his attorneys, and the State's plea offers. There was no evidence that he had ever been diagnosed with a mental health condition, and none of his four attorneys expressed doubts about his competence. *See Tucker*, 2016-Ohio-1354, at ¶ 8 (9th Dist.), quoting *Rubenstein*, 40 Ohio App.3d at 60-61 (8th Dist.). Although he claimed to hear voices, the trial court felt his claims were not genuine. The trial court had ample opportunity to observe him, review his filings, and make that determination. *See State v. Knox*, 2019-Ohio-2265, ¶ 11 (9th Dist.), quoting *State v. Ahmed*, 2004-Ohio-4190, ¶ 68 ("We are [] mindful that, with respect to competency issues, deference should be granted to those 'who see and hear what goes on in the courtroom.'"). Mr. Gilbert has not shown that "there were sufficient indicia of incompetency which required the trial court to order a competency evaluation." *Coker* at ¶ 18. Accordingly, his third assignment of error is overruled.

ASSIGNMENT OF ERROR IV

TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO IMPERMISSIBLE, IRRELEVANT, AND HIGHLY PREJUDICIAL TESTIMONY.

{¶29} In his fourth assignment of error, Mr. Gilbert argues that he received ineffective assistance of counsel when his attorney failed to object to certain evidence. For the following reasons, we reject his arguments.

{¶30} "[I]n Ohio, a properly licensed attorney is presumed competent." *State v. Gondor*, 2006-Ohio-6679, ¶ 62. To prevail on a claim of ineffective assistance of counsel, Mr. Gilbert must

establish: (1) that his counsel's performance was deficient to the extent that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment[;]" and (2) that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A deficient performance is one that falls below an objective standard of reasonable representation. *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. To establish prejudice, Mr. Gilbert must show that there existed a reasonable probability that, but for his counsel's errors, the outcome of the proceeding would have been different. *State v. Sowell*, 2016-Ohio-8025, ¶ 138. "This Court need not address both prongs of *Strickland* if an appellant fails to prove either prong." *State v. Carter*, 2017-Ohio-8847, ¶ 27 (9th Dist.).

B.O.'s Testimony

{¶31} B.O. testified that she began abusing drugs in her youth. She described past abuses and relationships that led her to drug-seeking behavior and exchanging sexual acts for narcotics. She testified that, when she could no longer afford pills, a friend introduced her to heroin. A few months later, that same friend introduced her to Mr. Gilbert.

{¶32} B.O. testified that she eventually had sex with Mr. Gilbert in exchange for heroin. By that point, she had lost jobs, her family, and her home. She testified that Mr. Gilbert offered her a place to stay and a way to help her earn money. She testified that he took her to a hotel and arranged for men to come to the hotel. The men would pay to have sex with her, and she would give the money to Mr. Gilbert.

{¶33} B.O. testified that, while at the hotel, she met K.S. She stated that K.S. was Mr. Gilbert's girlfriend at the time and had experience as a prostitute. B.O. testified that K.S. began arranging her appointments with men rather than Mr. Gilbert. Even so, Mr. Gilbert continued to collect the money B.O. earned. She testified that he would come to the hotel room to bring her

drugs. Before handing her the drugs, he would require her to perform oral sex on him. B.O. testified that she did so each time because she was addicted to the drugs and would get sick without them.

{¶34} B.O. described how she became completely dependent on Mr. Gilbert. She testified that he warned her not to buy drugs from anyone else. She understood that, if she did so, she would be beaten. She also testified that he would punish her if she defied instructions or failed to bring him money. On one occasion, he took her cell phone and left her for several days without a phone, money, food, or drugs.

{¶35} B.O. testified that she briefly escaped her situation with Mr. Gilbert after she borrowed a phone, called her mother to beg for help, and entered a rehab clinic. She received inpatient treatment before transferring to a sober living facility to undergo intensive outpatient therapy. When she used a weekend pass to visit her family, however, Mr. Gilbert sent her a message and came to her parents' house. She testified that he took her to meet a man for sex, and she immediately began using drugs that Mr. Gilbert offered her. Thereafter, she once again found herself sleeping with men who either Mr. Gilbert or K.S. arranged for her to meet. B.O. testified that she was expected to have sex with far more men than she had in the past. She also testified that Mr. Gilbert and K.S. began advertising her services online.

{¶36} B.O. began living with Mr. Gilbert and K.S., allowing him to have even more control over her life and her ability to access to drugs. She testified that K.S. was still Mr. Gilbert's girlfriend at the time, but K.S. was also an addict. She stated that Mr. Gilbert controlled K.S.'s drug intake and beat her if he felt she had slighted him. B.O. would see men at several area hotels, using rooms Mr. Gilbert had booked for her. She described how she later escaped her situation

with Mr. Gilbert for a second time only to eventually return to him. She testified that she did so because she felt hopeless and had nothing.

{¶37} B.O. testified that, after she returned to Mr. Gilbert, she learned that K.S. was no longer his girlfriend. Mr. Gilbert had a new girlfriend, and K.S. was living in a hotel room with another girl. B.O. testified that Mr. Gilbert paid weekly rent for her to have a hotel room across from the room occupied by K.S. and the third girl. She testified that she, K.S., and the third girl would post ads online, have sex with the men who answered, and give the money they earned to Mr. Gilbert. Either Mr. Gilbert or his new girlfriend would come to their hotel rooms to collect the money and bring them drugs.

{¶38} B.O. testified that the police eventually arrested the third girl. B.O. was then forced to share a hotel room with K.S. She testified that K.S. never wanted to listen, and she watched Mr. Gilbert beat K.S. on numerous occasions. She also testified that K.S. had a severe infection on her arm where she routinely injected heroin. B.O. described the infection as a "gaping wound . . . seeping everywhere all the time" that smelled "of rotting human flesh." She identified two photographs of the sheets and pillow on the bed in their hotel room. The photos depicted blood and pus that had seeped through a bandage she had placed on K.S.'s arm one evening. B.O. testified that Mr. Gilbert knew about the infection but did nothing about it. K.S. eventually had to have her arm amputated. B.O. stated that, right after the amputation, Mr. Gilbert brought K.S. back to the hotel room to continue having sex with men for money. B.O. later identified a photograph that depicted K.S. lying on the hotel bed with her arm amputated. B.O. testified that the picture showed a tattoo across K.S.'s stomach with Mr. Gilbert's first name. It also showed a spoon with fentanyl and heroin, syringes, and cotton positioned next to K.S. B.O. confirmed that Mr. Gilbert had gotten the drugs for K.S.

{¶39}  B.O. testified extensively about Mr. Gilbert's operation.  She testified that he had many different girls working for him over the years, and she eventually assumed the role of training and recruiting other women to work for him.  She testified as to prices for services, methods of contact between members of the operation, and the role drugs played.  She explained how Mr. Gilbert controlled her and the other girls through drugs, manipulation, guilt, coercion, and physical force.  She described how once, when she admitted she had given the police information, he vaginally raped her as she cried.

{¶40}  B.O. testified that circumstances eventually caused her to fear for her life to such a degree that she caused a scene, cut her wrist, and fled to a hospital.  At the hospital, she said she had tried to commit suicide, had been raped, and was being trafficked.  She testified that she was interviewed by the police and shared her story.  B.O. testified that she finally escaped Mr. Gilbert for good once she met a detective who helped her receive the help she needed.

{¶41}  Mr. Gilbert argues that his attorney should have objected when B.O. testified about: (1) traumas in her past unrelated to him, and (2) the physical condition of K.S.'s infected arm.  He argues that testimony was irrelevant to his charges, highly inflammatory/overly prejudicial, and offered strictly to garner sympathy from the jury.  He also argues that his attorney should have objected when the State introduced several photographs through B.O.  Two of those photographs depicted blood and pus that had seeped from K.S.'s arm and had collected on their hotel bedding.  A third photograph depicted K.S., post-amputation, lying on the hotel bed with Mr. Gilbert's first name tattooed across her stomach and drug paraphernalia at her side.  According to Mr. Gilbert, the photographs had no evidentiary value and were introduced solely to inflame the jury.  He argues that he received ineffective assistance of counsel because he was prejudiced when his attorney failed to object to the foregoing evidence.

{¶42} Upon review, Mr. Gilbert has not met his burden of establishing ineffective assistance of counsel with respect to his attorney's failure to object to B.O.'s testimony. To the extent defense counsel did not object to B.O.'s testimony about past traumas, "'[t]his Court has consistently held that trial counsel's failure to make objections is within the realm of trial tactics and does not establish ineffective assistance of counsel.'" *State v. Smith*, 2013-Ohio-3868, ¶ 24 (9th Dist.), quoting *State v. Guenther*, 2006-Ohio-767, ¶ 74 (9th Dist.). A review of the record reveals that defense counsel relied on the past traumas of each victim to bolster Mr. Gilbert's defense. He argued that Mr. Gilbert was only a drug dealer and the women who purchased drugs from him independently engaged in prostitution to support their drug habit. He argued that their troubled pasts led them down that road, not Mr. Gilbert. Accordingly, it appears defense counsel made a strategic decision not to object to any testimony about B.O.'s past traumas.

{¶43} Regarding B.O.'s testimony about K.S., Mr. Gilbert acknowledges that K.S. testified at trial. She testified about her arm infection/amputation. She also testified about one of the photographs at issue herein. That photograph showed her post-amputation, lying on a hotel bed with Mr. Gilbert's first name tattooed across her stomach and drug paraphernalia at her side. Mr. Gilbert has raised a separate challenge to K.S.'s testimony, which we address below. *See* Discussion of K.S.'s Testimony, *infra*. He has not explained how objections to B.O.'s testimony about K.S. and the photographs of her injuries would have changed the result in this matter, given that the same/similar evidence was admitted through K.S. *See Sowell*, 2016-Ohio-8025, at ¶ 138. Moreover, the record shows that Mr. Gilbert repeatedly referenced K.S.'s arm infection when he testified in his own defense. He described the infection in graphic detail and cited it as an example of the severity of her drug addiction. The defense theorized that K.S.'s addiction drove her behavior, not any coercion on the part of Mr. Gilbert. Defense counsel may well have made a

strategic decision not to object to B.O.'s testimony about K.S. and the photographs, given that Mr. Gilbert intended to highlight K.S.'s addiction in support of his defense. *See Smith* at ¶ 24, quoting *Guenther* at ¶ 74. Even if his failure to object was not a strategic choice, however, Mr. Gilbert has not shown that B.O.'s testimony about K.S. affected the outcome of his trial. *See Sowell* at ¶ 138.

K.S.'s Testimony

{¶44} K.S. testified that she was already using heroin when she met Mr. Gilbert through a friend. She also had already slept with men for money before, first at the instance of an ex-boyfriend and later of her own accord. When K.S. first met Mr. Gilbert, she understood him to be a drug dealer. She testified that she met him a few times, and he supplied her with drugs. He then brought her to stay at a house. K.S. testified that she had little memory of her first few days at the house because Mr. Gilbert gave her large quantities of drugs. She learned that he had engaged in anal sex with her, however, because he began bragging about it to other people. He also told K.S. that she was not allowed to leave the house. She testified that, when she tried to leave, he blackened her eye, locked her inside a room, and stationed someone at the door.

{¶45} K.S. testified that Mr. Gilbert claimed to love her during her time with him. He would supply her with drugs but would withhold them for a set number of hours. He also would make her perform oral sex on him before handing them over. K.S. testified that Mr. Gilbert took all her money, including money that a friend sent her via Western Union. She testified that he took her phone and used it to withdraw the money her friend had sent.

{¶46} K.S. testified that, to avoid physical punishments and feed her drug habit, she did whatever Mr. Gilbert told her to do. She admitted that she helped sell drugs. She admitted that she helped book male clients for women who were sleeping with men to earn money for Mr. Gilbert. She also admitted that she got Mr. Gilbert's name tattooed on her stomach. She testified

that the tattoo was Mr. Gilbert's idea. The State introduced a picture of the tattoo on her stomach during her testimony. According to K.S., Mr. Gilbert was in a gang, and the colors he chose for the tattoo represented his gang colors. The State linked the tattoo to the testimony of Detective John Morgan. The detective, who testified as an expert in human trafficking, testified that it is common for human traffickers to have their names tattooed on their victims to evidence their ownership of the person.

{¶47} K.S. testified that she stayed with Mr. Gilbert until he went to prison. At that point, she moved in with her parents and began purchasing drugs from a different dealer. K.S. testified that, as soon as Mr. Gilbert was released from prison, he found her. She testified that he broke her ribs because she had purchased drugs from another dealer. He once again began supplying her with drugs and forced her to sleep with men as payment. She testified that he would rent hotel rooms for her and other women so that they could see men there. She described how he would take all the money she earned and leave her with just a few dollars a day for food. At the same time, he would tell her that he loved her and make her promises. She testified that, after she lost her arm to amputation, he promised to purchase her a prosthetic one.

{¶48} K.S. testified that Mr. Gilbert gave her a cell phone and required her to contact him at certain times of day. When he felt she was sleeping too much and not seeing enough men, he would give her crack cocaine (a stimulant) instead of heroin (a depressant). He also routinely beat her. She testified that she witnessed Mr. Gilbert beating other women as well. She stated that there were always consequences for disobeying him or failing to earn enough money for him.

{¶49} K.S. agreed that she routinely injected the heroin she received from Mr. Gilbert and ultimately had to have her arm amputated. She testified that she was "almost dead" by the time she was admitted to the hospital. Nevertheless, K.S. testified, she was only in the hospital for one

day following her amputation. She stated that she immediately met with Mr. Gilbert upon her release, and he provided her with heroin and crack "to feel better." She testified that, a few hours later, she resumed sleeping with men for Mr. Gilbert.

{¶50} Mr. Gilbert argues that his attorney should have objected when K.S. testified that he: (1) once used her cell phone to steal money wired to her through Western Union; (2) was involved in a gang; and (3) promised to buy her a prosthetic arm. He argues that the testimony constituted improper other acts evidence. He argues that it was irrelevant to his charges, unduly prejudicial, and offered solely to paint him in a negative light. Further, Mr. Gilbert argues that his attorney should have objected when K.S. was shown a photograph of the tattoo on her stomach because it depicted K.S. post-amputation in deplorable condition. He insists the photograph was introduced solely to inflame the jury.

{¶51} As previously noted, an attorney's failure to object generally falls "'within the realm of trial tactics and does not establish ineffective assistance of counsel.'" *Smith*, 2013-Ohio-3868, at ¶ 24 (9th Dist.), quoting *Guenther*, 2006-Ohio-767, at ¶ 74 (9th Dist.). K.S.'s testimony about Mr. Gilbert taking her Western Union money, being involved in a gang, and promising her a prosthetic arm was extremely brief. Each of those topics spanned only a few lines of transcript. "Defense counsel may well have made a strategic decision not to object to [that] testimony because an objection would have drawn more attention to [it]. . . ." *State v. Sandin*, 2023-Ohio-174, ¶ 22 (9th Dist.).

{¶52} Regarding the photograph of K.S.'s tattoo, the record reflects that the State introduced the photograph, in part, to link it to expert testimony provided by Detective Morgan. Even assuming defense counsel ought to have objected to the photograph, however, there was extensive testimony corroborating each element depicted therein. B.O., K.S., and Mr. Gilbert

testified that K.S.'s arm became extremely infected and resulted in an amputation. K.S. described herself as being "almost dead" by the time the procedure was performed. The photograph showed K.S. surrounded by drug paraphernalia, and both women testified that she was severely addicted to drugs she procured from Mr. Gilbert. Moreover, both women testified that, within hours of K.S. being released from the hospital, Mr. Gilbert brought her back to her hotel room and forced her to resume sleeping with men for money. Mr. Gilbert has not shown that there is a reasonable probability that, but for his attorney's failure to object to the photograph, the jury would not have convicted him. *See Sowell*, 2016-Ohio-8025, at ¶ 138.

B.R.'s Testimony

{¶53} B.R. briefly testified that, growing up, her family life "was sort of dysfunctional" because her dad had PTSD. She indicated that she began smoking marijuana when she was young, took painkillers after high school, and eventually started using heroin. She testified that her addiction ultimately led her to Mr. Gilbert, who she met through a fellow addict.

{¶54} B.R. testified that Mr. Gilbert supplied her with heroin and crack. At first, she was able to pay him for the drugs using money she made from her job. She later lost her job due to her addiction. At that point, she began sleeping with men for money. She testified that Mr. Gilbert would arrange for her to meet men at his house or in their cars. She would have sex with the men and give the money she earned to Mr. Gilbert in exchange for drugs. She testified that he also forced her to perform sexual acts before he would give her the drugs.

{¶55} B.R. testified that she continued to work for Mr. Gilbert for three months. During that time, she mostly lived at his residence along with K.S. and several others. She testified that she left when a family member arranged addiction treatment for her. B.R. then managed to stay away from Mr. Gilbert for about ten months. During that time, she overdosed twice, incurred

criminal charges, and suffered permanent hearing loss due to one of her overdoses. She testified that she ultimately contacted Mr. Gilbert through K.S. because she felt hopeless and wanted to keep using drugs.

{¶56} B.R. testified that she began living with K.S. in hotel rooms rented by Mr. Gilbert. B.R. resumed having sex with men to pay for her drug habit. She testified that K.S. would book male clients for the two of them as they both paid Mr. Gilbert for drugs. B.R. testified that she saw Mr. Gilbert several times a day because she could not last more than a few hours before she began experiencing painful drug withdrawal symptoms. She also testified that Mr. Gilbert expected her and K.S. to earn a certain amount of money each day. If they failed to meet their quota, he would beat them. B.R. testified that she witnessed Mr. Gilbert sexually assaulting other girls who failed to earn enough money for him. She indicated that her time with Mr. Gilbert finally ended when the police arrested her on an outstanding warrant.

{¶57} Mr. Gilbert argues that he received ineffective assistance of counsel when his attorney failed to object to "the victim-impact testimony of [B.R.]" He cites two pages of transcript wherein the Stated asked B.R. about her family life growing up and aspirations she had upon graduating high school. According to Mr. Gilbert, "[t]he effect of this line of questioning was to lead the jury to the conclusion that she did not ever reach her dreams because she came into contact with [him]." He argues that his attorney should have objected to that testimony because it was irrelevant to his charges and only offered for emotional impact.

{¶58} Upon review, Mr. Gilbert has not shown that there exists a reasonable probability that, but for his counsel's failure to object to B.R.'s "victim-impact" testimony, the result of proceedings would have been different. *See Sowell*, 2016-Ohio-8025, at ¶ 138. The State produced a wealth of evidence against him. Indeed, B.R. testified extensively about his

wrongdoings. Her "victim-impact" testimony accounted for a very minor portion of her overall testimony. Even if we were to assume that defense counsel did not make a strategic decision to withhold objections to that portion of her testimony, Mr. Gilbert has not explained how it impacted the jury's verdicts given the overwhelming evidence against him. *See Strickland*, 466 U.S. at 687. This Court will not undertake an analysis on his behalf. *See* App.R. 16(A)(7); *Cardone v. Cardone*, 1998 WL 224934, *8 (9th Dist. May 6, 1998). We must conclude that Mr. Gilbert has not established a claim of ineffective assistance of counsel. Accordingly, his fourth assignment of error is overruled.

**{¶59}** ASSIGNMENT OF ERROR V

THE TRIAL COURT ERRED IN OVERRULING DEFENSE COUNSEL'S OBJECTION WHERE THE STATE ELICITED OVERLY REPETITIVE, CUMULATIVE EVIDENCE FROM DETECTIVE ADAM GARVIN.

**{¶60}** In his fifth assignment of error, Mr. Gilbert argues the trial court erred when it overruled his objections to the testimony of Detective Adam Garvin. He argues that the State used the detective to introduce repetitive and cumulative evidence that only served to bolster its case. For the following reasons, we reject his argument.

**{¶61}** "This Court generally reviews a trial court's decision to admit or exclude evidence for an abuse of discretion." *State v. Hartwell*, 2025-Ohio-2278, ¶ 18 (9th Dist.). A court's evidentiary ruling is only subject to reversal if the court abused its discretion and the ruling materially prejudiced the defendant. *State v. Ivery*, 2018-Ohio-2177, ¶ 23 (9th Dist.), quoting *State v. Martin*, 19 Ohio St.3d 122, 129 (1985). An error is harmless if the State shows "that the error did not affect the defendant's substantial rights." *State v. Bond*, 2022-Ohio-4150, ¶ 7. An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶62} Detective Adam Garvin testified that he helped investigate cell phone records, hotel records, and bank records in this matter. He extracted information from B.O.'s cell phone. He also had a joint meeting with B.O. and Detective Morgan. From their conversation, he learned that Mr. Gilbert was using several different hotels to conduct his human trafficking operation. Detective Garvin testified that he subpoenaed the hotel records. He confirmed that they showed hotel rooms were rented either under B.O.'s name or Mr. Gilbert's name on specific dates. When he began to testify about those details, Mr. Gilbert objected. He argued that no one was disputing the fact that he had paid for some of the hotel rooms where the victims stayed. The State responded that it was asking Detective Garvin to confirm the specific dates and hotels because he would be comparing that information to Mr. Gilbert's bank records. The trial court overruled Mr. Gilbert's objection. Detective Garvin testified that he subpoenaed Mr. Gilbert's bank records and compared them to the hotel records. He confirmed that funds from Mr. Gilbert's bank account were used to pay for the hotel rooms.

{¶63} Detective Garvin testified that B.O. led investigators to a second cell phone that she had used to communicate with Mr. Gilbert. He testified that the police found the phone in a car parked behind a business in Cleveland. The State began to ask Detective Garvin about some of the text messages found on the phone. Mr. Gilbert objected because the defense had already introduced the messages through B.O. after the defense had stipulated to them. The court gave the State some leeway, as the prosecutor indicated that he was briefly laying a foundation for new testimony. When the State continued to review messages that had already been introduced, the court instructed the prosecutor to move on. The State then asked Detective Garvin about new text messages that had not previously been introduced. In the messages, B.O. sought instructions from Mr. Gilbert about meeting a client. She also notified him of her schedule and told him about rent

payments due at the hotel.  Mr. Gilbert responded with additional questions and answers about how to proceed.

{¶64}  Mr. Gilbert argues that the court erred by admitting Detective Garvin's testimony because it was "overly repetitive and cumulative . . . ."  He notes that he objected multiple times because the State used the detective to rehash testimony that had already been given.  According to Mr. Gilbert, other witnesses testified about the hotel rooms he rented and the text messages he exchanged with B.O.  He argues that the State only offered the detective's testimony to bolster the testimony of those witnesses.  Thus, he argues the trial court erred by overruling his objections to the detective's testimony.

{¶65}  This Court rejects Mr. Gilbert's argument for two reasons.  First, he has not shown that the trial court went so far as to abuse its discretion in its evidentiary rulings.  *See Hartwell*, 2025-Ohio-2278, at ¶ 18 (9th Dist.).  The State introduced new evidence through Detective Garvin: Mr. Gilbert's bank records and certain text messages he exchanged with B.O.  The record reflects that the court sought to limit the introduction of previously introduced evidence while, at the same time, allowing the State some leeway to provide context for that new evidence.  Mr. Gilbert has not addressed the balance the trial court sought to achieve or its rationale for its rulings.  Second, the record reflects that, at best, any error in the introduction of the detective's "overly repetitive and cumulative" testimony was harmless.  The jury heard the same evidence from other witnesses, and the evidence was not graphic or inflammatory in nature.  Moreover, it was only one small piece of the overwhelming case the State built against Mr. Gilbert.  Upon review, we conclude that the trial court's evidentiary rulings did not amount to an abuse of discretion or affect Mr. Gilbert's substantial rights.  *Ivery*, 2018-Ohio-2177, at ¶ 23 (9th Dist.), quoting *Martin*, 19 Ohio St.3d at 129; *Bond*, 2022-Ohio-4150, at ¶ 7.  As such, his fifth assignment of error is overruled.

ASSIGNMENT OF ERROR VI

THE TRIAL COURT ERRED IN PERMITTING THE TESTIMONY OF JOHN
MORGAN DESPITE DEFENSE COUNSEL DAUBERT CHALLENGE.

{¶66} In his sixth assignment of error, Mr. Gilbert argues the trial court erred when it allowed Detective John Morgan to testify. He argues that most of the detective's testimony constituted inadmissible hearsay because he was not qualified to testify as an expert. Upon review, we reject his argument.

{¶67} As previously noted, evidentiary determinations are generally subject to the abuse of discretion standard of review. *Hartwell*, 2025-Ohio-2278, at ¶ 18 (9th Dist.). A court's evidentiary ruling is only subject to reversal if the court abused its discretion and the ruling materially prejudiced the defendant. *Ivery*, 2018-Ohio-2177, at ¶ 23 (9th Dist.), quoting *Martin*, 19 Ohio St.3d at 129. An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore*, 5 Ohio St.3d at 219.

{¶68} "'In general, courts should admit [expert] testimony when material and relevant, in accordance with Evid.R. 702 . . . .'" *State v. Irvine*, 2019-Ohio-959, ¶ 33 (9th Dist.), quoting *Terry v. Caputo*, 2007-Ohio-5023, ¶ 16.

> An expert may be qualified by reason of his or her specialized knowledge, skill, experience, training, or education to give an opinion that will assist the jury in understanding the evidence and determining a fact at issue. Neither special education nor certification is necessary to confer expert status upon a witness. The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function.

*State v. Drummond*, 2006-Ohio-5084, ¶ 113.

{¶69} "A trial court need not always hold a separate *Daubert* hearing prior to the testimony of an expert." *State v. Roberts*, 2017-Ohio-9079, ¶ 16 (9th Dist.). "'The trial court must have the same kind of latitude in deciding how to test an expert's reliability, and to decide whether

or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable.'" *Sliwinski v. St. Edwards*, 2014-Ohio-4655, ¶ 15 (9th Dist.), quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

{¶70} The State filed its notice of intent to call Detective Morgan as an expert more than four months before Mr. Gilbert's trial occurred. It identified the detective as a subject matter expert in the area of human trafficking. On the morning of trial, Mr. Gilbert requested a *Daubert* hearing.[1] He argued that Detective Morgan was not qualified to offer any type of psychological testimony related to the state of mind of the alleged victims. He further argued that, to the extent the detective intended to testify about sex trafficking in general terms, his testimony was speculative because it was not linked to the alleged victims.

{¶71} The trial court heard argument from the State. The State outlined Detective Morgan's expertise and provided supporting authority for the subject matter of his testimony. The State denied that the detective would be offering any type of psychological testimony. Instead, the detective would explain the subculture, mechanics, and terminology of human trafficking based on his training and experience interacting with victims and traffickers. Further, the State argued the detective's testimony was not speculative because he had interacted with several of the victims named in Mr. Gilbert's indictment.

{¶72} After listening to both parties, the court entered a ruling. The court indicated that it would allow the State to call Detective Morgan to testify so that he might provide context for the State's case regarding the subculture of human trafficking. The court noted that, should the

---

[1] It appears from the trial transcript that Mr. Gilbert provided the State and the trial court with a hard copy of a motion he filed for a *Daubert* hearing. We note that the motion was never filed, so it is not included in the record.

detective's testimony stray from those parameters, it would be attentive to any objections Mr. Gilbert might raise. The court expressed its willingness to excuse the jury and allow further discussion if necessary.

{¶73} The State called Detective Morgan as its first witness. He testified that he had been investigating human trafficking cases for more than 15 years and was currently assigned to the Northeast Ohio Human Trafficking Task Force. He explained the concept of human trafficking, common methods and language used by traffickers, the relationship between human trafficking and drug abuse, and physical indicators one might observe in a victim of human trafficking. He explained how traffickers cause their victims to become dependent through force, fraud, and/or coercion. He also explained how traffickers might advertise their victims' services, including on specific online platforms. Detective Morgan testified that he was able to meet four of the victims named in Mr. Gilbert's indictment. It was his opinion that all four women had been involved in sex trafficking. He explained that he based his opinion on a totality of factors, including physical indicators of abuse he observed, the terminology the women used, and how they described their respective situations.

{¶74} Mr. Gilbert argues that Detective Morgan was not qualified to testify as an expert. He notes that the trial court overruled his request for a *Daubert* hearing. According to Mr. Gilbert, the detective was allowed to offer "hearsay testimonials of prior cases, unsupported statements [about] what constitutes 'pimping,' . . . [a] legal definition of trafficking, and sweeping generalizations about what constitutes trafficking . . . as concrete fact." Further, he argues that the detective was not qualified to offer psychological testimony about the impact drugs had on the alleged victims' psyches.

{¶75} To the extent Mr. Gilbert argues that the court erred by not conducting a *Daubert* hearing, we note that it was not required to do so. *See Roberts*, 2017-Ohio-9079, at ¶ 16 (9th Dist.). Mr. Gilbert did not seek a *Daubert* hearing until the morning of trial. A separate hearing would have further delayed the proceedings. Moreover, Detective Morgan was not offering any technical, scientific, or experiment-based testimony that might trigger additional scrutiny. *See* Evid.R. 702(C). The State explained that his testimony was based strictly on his education, training, and investigative experience in the area of human trafficking and its subculture. The trial court was in the best position to hear arguments and determine, in its sound discretion, whether a separate hearing was required to test Detective Morgan's reliability. *See Sliwinski*, 2014-Ohio-4655, at ¶ 15 (9th Dist.), quoting *Kumho Tire Co., Ltd.*, 526 U.S. at 152. Although the court did not conduct a separate hearing, it gave Mr. Gilbert the option of objecting during the detective's testimony to request further discussion outside the presence of the jury. Mr. Gilbert has not shown that the court abused its discretion by doing so. Accordingly, we reject his argument that the court erred by not holding a separate *Daubert* hearing.

{¶76} Having reviewed the record, we likewise reject Mr. Gilbert's argument that the trial court erred by allowing Detective Morgan to testify. Mr. Gilbert's brief cites eleven specific examples of testimony the detective gave. He argues the testimony was problematic for various reasons. Yet, the record shows that he did not object to any of that testimony. His brief contains a single statement wherein he notes that, in the event he did not object to the detective's testimony, he "alternatively raises [his] claim as plain error." Yet, he has not set forth any analysis related to a claim of plain error. We will not construct an argument on his behalf. *See* App.R. 16(A)(7); *Cardone*, 1998 WL 224934, at *8 (9th Dist.). Upon review, Mr. Gilbert has not shown that the

trial court erred when it allowed Detective Morgan to offer expert testimony. As such, his sixth assignment of error is overruled.

## ASSIGNMENT OF ERROR VII

THE TRIAL RECORD REVEALS PLAIN ERROR WHERE THE RECORD IS SILENT AS TO WHETHER APPELLANT KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY WAIVED HIS RIGHT TO WEAR CIVILIAN CLOTHES[.]

## ASSIGNMENT OF ERROR IX

FAILURE TO INSTRUCT AND ADMONISH THE JURY THAT IT MAY NOT CONSIDER THE APPELLANT'S CLOTHING RESULTED IN PLAIN ERROR.

{¶77} In his seventh assignment of error, Mr. Gilbert argues that plain error occurred when the trial court failed to ensure that he knowingly, intelligently, and voluntarily waived his right to wear civilian clothes at trial. In his ninth assignment of error, he argues that plain error occurred when the trial court failed to issue the jury a curative instruction regarding his attire. We reject both arguments.

{¶78} "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). "The plain error doctrine requires there to be: (1) a deviation from a legal rule; (2) that is an obvious defect in the trial; and (3) that affects the appellant's substantial rights." *State v. Ford*, 2023-Ohio-2220, ¶ 32 (9th Dist.), citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). A defendant bears the burden of demonstrating plain error. *State v. Perry*, 2004-Ohio-297, ¶ 14. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶79} "The Fourteenth Amendment to the United States Constitution precludes the state from compelling an accused to stand trial before a jury, over his objection, in identifiable prison

clothes." *State v. Blackmon*, 1992 WL 2945, *6 (9th Dist. Jan. 2, 1992). Nevertheless, "there is no recognized constitutional duty to read to a defendant his dress rights for trial." *State v. Moon*, 44 Ohio App.2d 275, 282 (2d Dist. 1975). Nor is there a "rule of law which states that a trial may never be held while a defendant is attired in prison clothing." *State v. Smith*, 1986 WL 8196, *1 (9th Dist. July 23, 1986). A defendant can forfeit his right to wear civilian clothing at trial. *Blackmon* at *7. He can also affirmatively waive that right by choosing to wear prison clothes. *Id.* Courts have recognized that "'a prisoner may want to appear in prison garb as part of a trial strategy designed to evoke jury sympathy.'" *Moon* at 279, quoting *Gaito v. Brierley*, 485 F.2d 86, 88, fn. 3 (3d Cir. 1973).

{¶80} At the start of trial, the trial court noted that Mr. Gilbert had appeared for trial in his jail attire. The court asked whether it was correct in its understanding that Mr. Gilbert was choosing to wear his jail attire. Mr. Gilbert responded affirmatively. The following exchange took place:

> THE COURT: And I'm assuming that that is a strategic decision that you have decided to make; is that correct.
>
> [MR. GILBERT]: Yes.
>
> THE COURT: Okay. You have been offered the opportunity to wear nonprison or . . . to wear clothing that doesn't suggest that you're incarcerated, is that correct, you've been offered that opportunity.
>
> [MR. GILBERT]: Yes.
>
> THE COURT: And you've rejected that opportunity.
>
> [MR. GILBERT]: Yes.

The court then asked whether Mr. Gilbert's attorney or the prosecutor had anything to add. Mr. Gilbert's attorney did not. The prosecutor noted for the record that, "while [Mr. Gilbert] has

decided to appear in jail attire with a striped shirt and striped pants he is not otherwise shackled." Thus, the jury saw Mr. Gilbert in jail attire but not restraints.

{¶81} Mr. Gilbert acknowledges that he elected to wear jail attire to his trial. Nevertheless, he argues that plain error occurred because the record is silent as to whether he knowingly, intelligently, and voluntarily waived his right to wear civilian clothes. He notes that the trial court never cautioned him "as to the risk of prejudice nor the impairment of the due process presumption of innocence." He also argues that plain error occurred because the court did not instruct the jury that they were not to infer anything from the fact that he was dressed in jail attire.

{¶82} As noted, the Due Process Clause only forbids a trial court from *compelling* a defendant to appear in jail attire over objection. *Blackmon*, 1992 WL 2945, at *6 (9th Dist.). No one forced Mr. Gilbert to wear jail clothes to his trial. He chose to do so. The trial court specifically asked him whether he had been offered the opportunity to wear clothing "that doesn't suggest that you're incarcerated . . . ." Mr. Gilbert agreed he had been given that opportunity. He has not shown that the trial court was required to engage in a more extensive inquiry. *See Moon*, 44 Ohio App.2d at 282 ("[T]here is no recognized constitutional duty to read to a defendant his dress rights for trial."). Moreover, even assuming the court's limited inquiry resulted in a forfeiture rather than a waiver, Mr. Gilbert has not shown that a more in-depth inquiry would have changed the outcome in this matter. *See Ford*, 2023-Ohio-2220, at ¶ 32 (9th Dist.), citing *Barnes*, 94 Ohio St.3d at 27. He admitted his decision to wear jail attire was a strategic one. He has not even argued that, had the court issued him additional cautions, he would have changed his strategy. This Court will not construct an argument on his behalf. *See* App.R. 16(A)(7); *Cardone*, 1998 WL 224934, at *8 (9th Dist.).

{¶83} We likewise reject Mr. Gilbert's argument that plain error occurred because the trial court did not issue the jury a curative instruction regarding his attire. The only case he cites in support of his argument is *State v. Hunley*, 2013-Ohio-628 (6th Dist.). Yet, *Hunley* never held that a trial court is required to offer a curative instruction when a defendant chooses to go to trial in jail attire. The *Hunley* Court simply considered the curative instruction issued therein as one factor in its due process analysis. *See Hunley* at ¶ 9. Moreover, unlike Mr. Gilbert, the defendant in *Hunley* went to trial in jail attire and handcuffs, which were secured behind his back. *See id.* at ¶ 8. The handcuffs created an additional due process concern that is not present in this case. Mr. Gilbert was neither handcuffed nor shackled for trial.

{¶84} Upon review, Mr. Gilbert has not proven his claim of plain error. He has not shown that the trial court was required to issue the jury a curative instruction. Nor has he explained how its failure to issue that instruction affected his substantial rights. *See Ford*, 2023-Ohio-2220, at ¶ 32 (9th Dist.), citing *Barnes*, 94 Ohio St.3d at 27. He has made no attempt to examine the evidence presented at trial and explain why, but for the trial court's failure to issue the instruction, the outcome of his trial would have been different. Again, it is not the function of this Court to create an argument on his behalf. *See* App.R. 16(A)(7); *Cardone*, 1998 WL 224934, at *8 (9th Dist.). Because Mr. Gilbert has not demonstrated plain error, his seventh and ninth assignments of error are overruled.

ASSIGNMENT OF ERROR VIII

THE STATE ENGAGED IN PROSECUTORIAL MISCONDUCT WHEN IT QUESTIONED AND COMMENTED ON APPELLANT[']S TRIAL CLOTHES.

{¶85} In his eighth assignment of error, Mr. Gilbert argues prosecutorial misconduct occurred when the State commented on his decision to wear jail clothes to trial. For the following reasons, we reject his argument.

{¶86} "In deciding whether a prosecutor's conduct rises to the level of prosecutorial misconduct, a court determines if the prosecutor's actions were improper, and, if so, whether the defendant's substantial rights were actually prejudiced." *State v. Haywood*, 2017-Ohio-8299, ¶ 19 (9th Dist.), citing *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). "[A] judgment may only be reversed for prosecutorial misconduct when the improper conduct deprives the defendant of a fair trial." *Haywood* at ¶ 19, quoting *State v. Knight*, 2004-Ohio-1227, ¶ 6 (9th Dist.). "The defendant must show that, but for the prosecutor's misconduct, the trier of fact would not have convicted him." *State v. Ecker*, 2018-Ohio-940, ¶ 28 (9th Dist.). "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *Id.*, quoting *State v. Diar*, 2008-Ohio-6266, ¶ 140. "Thus, '[t]he prosecutor's conduct must be considered in the context of the entire trial.'" (Alteration in original.) *Ecker* at ¶ 28, quoting *State v. Pleban*, 2011-Ohio-3254, ¶ 39 (9th Dist.).

{¶87} Mr. Gilbert testified in his own defense. He testified extensively about his own personal troubles and how he came to sell drugs. He testified that he either sold drugs to or with the women named in his indictment, including K.S. and B.O. According to Mr. Gilbert, however, he never manipulated, forced, or compelled the women to do anything. He stated that he told the women it was important they only bought drugs from him because there was a danger they could overdose and die if they purchased tainted drugs elsewhere. He denied ever imposing punishments on them or sexually assaulting them. He described the women as addicts who routinely made their own poor decisions and chose to prostitute themselves to pay for drugs.

{¶88} At the start of cross-examination, the prosecutor asked Mr. Gilbert whether he agreed that he enjoyed manipulating people. The State ultimately played for Mr. Gilbert a tape of him speaking to one of the victims and telling her that he was trying to manipulate her and other women. Mr. Gilbert agreed he had said he was manipulating people. The prosecutor then asked

Mr. Gilbert why he was wearing jail clothes, and Mr. Gilbert admitted that he had chosen to do so. The prosecutor asked Mr. Gilbert about a phone call he had with his mother on the third day of trial. During that call, Mr. Gilbert stated that he wanted to "look rough" when he went to court. The prosecutor continued with the theme of manipulation, citing other examples of statements Mr. Gilbert made in jail calls and letters he wrote from jail. The prosecutor also asked Mr. Gilbert to read Facebook posts he made, including: "Started off broke but I tricked these bitches like they fishes because they nothing but bait. Now I trick these bitches and get money." Additionally, the State asked Mr. Gilbert about a large number of text messages he had sent, including threatening messages and messages about rates for the sexual services various women would be providing.

{¶89} Mr. Gilbert argues the prosecutor engaged in misconduct when he commented on Mr. Gilbert's choice to wear jail attire to trial. According to Mr. Gilbert, the prosecutor's questions were "designed [to] exacerbate the prejudicial effect of [his] clothing." He argues that the prosecutor's comments were so extreme that they undermined the fairness of the proceedings.

{¶90} Even assuming the prosecutor engaged in misconduct when he asked Mr. Gilbert about his choice to wear jail clothing to trial, Mr. Gilbert has not shown that the misconduct deprived him of a fair trial. *Haywood*, 2017-Ohio-8299, at ¶ 19 (9th Dist.). The prosecutor cited numerous examples of manipulation on the part of Mr. Gilbert, the majority of which were evidenced by his own recorded or written statements. The jury heard evidence that he used drugs, manipulation, guilt, coercion, and physical force to compel women to sleep with men for money they then gave to Mr. Gilbert. Many women testified against him, and the State corroborated their testimony through phone messages, hotel records, bank records, and other evidence. Mr. Gilbert has not shown that, but for the prosecutor's few questions about his jail clothing, the jury would not have convicted him. *See Ecker*, 2018-Ohio-940, at ¶ 28 (9th Dist.). Accordingly, we reject

his argument that prosecutorial misconduct deprived him of a fair trial. His eighth assignment of error is overruled.

## ASSIGNMENT OF ERROR X

THE USE OF PREJUDICIAL TERMS 'VICTIM' AND [']GIRL' TO DESCRIBE
THE COMPLAINING WITNESS WAS TANTAMOUNT TO PLAIN ERROR[.]

{¶91} In his tenth assignment of error, Mr. Gilbert argues that he was prejudiced when the State used the terms "victim" and "girl" to refer to a complaining witness. He argues that those terms could have prejudiced the jury against him by triggering preconceived notions. Yet, speculation as to whether something may or may not have influenced a jury's verdicts will not establish prejudice. *See State v. Kirkbride*, 2024-Ohio-291, ¶ 26 (9th Dist.). Mr. Gilbert must demonstrate both error and the error's impact on the verdict. *See id.* His brief does not contain a single citation to the transcript wherein the State used the term "victim" or "girl" to refer to an individual at trial. As the appellant, it was his duty "to demonstrate error on appeal and to include appropriate citations to the transcripts and record in support of [his] argument." *State v. Patel*, 2008-Ohio-4692, ¶ 55 (9th Dist.). This Court will not construct an argument on his behalf. *See* App.R. 16(A)(7); *Cardone*, 1998 WL 224934, at *8 (9th Dist.). Because Mr. Gilbert has not established error or resulting prejudice, his tenth assignment of error is overruled.

## ASSIGNMENT OF ERROR XI

THE CUMULATIVE EFFECT OF MULTIPLE ERROR DEPRIVED
APPELLANT OF HIS CONSTITUTIONALL (sic) GAURANTEED (sic) RIGHT
TO A FAIR TRIAL UNDER THE FEDERAL AND STATE CONSTITUION
(sic).

{¶92} In his eleventh assignment of error, Mr. Gilbert argues that the cumulative effect of the errors he has raised on appeal deprived him of a fair trial. We reject his argument.

{¶93} Under the cumulative error doctrine, a conviction may be reversed when the cumulative effect of errors deprives a defendant of the constitutional right to a fair trial even though none of the errors, in isolation, was prejudicial. *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus. In the absence of multiple errors, the cumulative error doctrine does not apply. *State v. Hunter*, 2011-Ohio-6524, ¶ 132. Likewise, if a defendant fails "'to demonstrate any prejudice resulting from the errors he has alleged, he cannot demonstrate cumulative error.'" *State v. Straughan*, 2021-Ohio-1054, ¶ 68 (9th Dist.), quoting *In re F.B.*, 2019-Ohio-1738, ¶ 47 (9th Dist.).

{¶94} Mr. Gilbert has not shown that multiple errors occurred during his trial or that he was prejudiced as a result of any errors that occurred. Accordingly, he has not established cumulative error. *See Hunter* at ¶ 132; *Straughan* at ¶ 68. His eleventh assignment of error is overruled.

### III.

{¶95} Mr. Gilbert's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

—

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
JILL FLAGG LANZINGER
FOR THE COURT

STEVENSON, J.
CONCURS.

CARR, J.
CONCURRING IN JUDGMENT ONLY.

{¶96} I concur in the majority's judgment. I agree that Gilbert's convictions should be affirmed. The evidence against him was overwhelming and his crimes were truly horrendous. If nothing else is clear from the record, it is that Gilbert is a master of manipulation. He manipulated the victims and tried repeatedly to manipulate the court and justice system over the course of this litigation.

{¶97} With respect to his first two assignments of error, the sole issue before this Court is whether Gilbert was entitled to represent himself in light of the circumstances before the trial court. "The assertion of the right to self-representation must be clear and unequivocal. A request for self-representation may be denied when circumstances indicate that the request is made for purposes of delay or manipulation of the trial process." (Internal citations omitted.) *State v.*

*Neyland*, 2014-Ohio-1914, ¶ 72. In addition, "[a] trial court may deny a defendant's request for self-representation if it is untimely made." *Id.* at ¶ 76. On appeal, Gilbert has not demonstrated that the trial court erred in concluding that Gilbert's request to represent himself was equivocal, untimely, and, amounted to a delay tactic. There was substantial evidence that Gilbert's request for self-representation was just another attempt to manipulate the proceedings. At the same time Gilbert was asking to represent himself, he was also questioning whether he could hire new counsel and raising issues relating to his own competency to stand trial. It was not unreasonable for the trial court to determine that Gilbert was not actually interested in representing himself, and, instead, was seeking to delay the trial as long as possible.

{¶98} As to Gilbert's third assignment of error, I agree that it is properly overruled.

"[T]he court, prosecutor, or defense may raise the issue of the defendant's competence to stand trial." R.C. 2945.37(B). "If the issue is raised before the trial has commenced, the court shall hold a hearing on the issue." *Id*. "A defendant is presumed to be competent to stand trial." R.C. 2945.37(G). To rebut this presumption, the defendant's incompetency to stand trial must be established at the hearing by a preponderance of the evidence.

*State v. Mills*, 2023-Ohio-4716, ¶ 12. "But a court's failure to hold a mandatory competency hearing is not a basis for automatic reversal." *Id.* at ¶ 14. "[T]he failure to hold a mandatory competency hearing is harmless error where the record fails to reveal sufficient indicia of incompetency." *Id.*, quoting *State v. Bock*, 28 Ohio St.3d 108, 110 (1986).

{¶99} Here, it appears that Gilbert raised issues related to his competence prior to trial. And while a specific competency hearing was not held, the trial court did proceed to address the issue at the proceeding that was being held. Nonetheless, even assuming Gilbert's actions were sufficient to trigger the duty of the trial court to hold a hearing, and that the proceeding that occurred was insufficient, I would conclude any error in that failure was harmless. As mentioned previously, Gilbert is an incredibly manipulative individual, and the record fails to disclose

sufficient indicia of incompetency. Accordingly, I can only conclude that any possible error in failing to hold a competency hearing was harmless.

{¶100} Additionally, I concur that Gilbert did not demonstrate ineffective assistance of counsel. The aspects of the victims' testimony which Gilbert argues warranted objection, including the background information and details about what happened, were admissible. In order for Gilbert to be found guilty of trafficking in persons, the State had to demonstrate that Gilbert coerced the victims. *See* R.C. 2905.32(A)(1), (B). The information that Gilbert contends was objectionable, was in fact relevant to help prove the State's case.

APPEARANCES:

KIMBERLY KENDALL CORRAL, Attorney at Law, for Appellant.

GABRIELLE M. PLOPLIS, Attorney at Law, for Appellant.

ANTHONY CILLO, Prosecuting Attorney, and LINDSEY C. POPROCKI, Assistant Prosecuting Attorney, for Appellee.